**In re Richard R. RYDER.**

**Civ. A. No. 4976.**

United States District Court
E. D. Virginia,
Richmond Division.

Jan. 23, 1967.

---

C. V. Spratley, Jr., U. S. Atty., Samuel W. Phillips, T. P. Baer, Asst. U. S. Attys., for the United States.

Leith S. Bremner, Edward A. Marks, Jr., David J. Mays, Richmond, Va., for Richard R. Ryder.

Paul M. Shuford, Richmond, Va., for the Bar Association of the City of Richmond, amicus curiæ.

Before HOFFMAN, Chief Judge, and LEWIS and BUTZNER, Judges.

## MEMORANDUM

PER CURIAM.

This proceeding was instituted to determine whether Richard R. Ryder should be removed from the roll of attorneys qualified to practice before this court. Ryder was admitted to this bar in 1953. He formerly served five years as an Assistant United States Attorney. He has an active trial practice, including both civil and criminal cases.

In proceedings of this kind the charges must be sustained by clear and convincing proof, the misconduct must be fraudulent, intentional, and the result of improper motives. See In re Fisher, 179 F.2d 361 (7th Cir. 1950), cert. denied sub nom. Kerner v. Fisher, 340 U.S. 825, 71 S.Ct. 59, 95 L.Ed. 606 (1950). We conclude that these strict requirements have been satisfied. Ryder took possession of stolen money and a sawed-off shotgun, knowing that the money had been stolen and that the gun had been used in an armed robbery. He intended

to retain this property pending his client's trial unless the government discovered it. He intended by his possession to destroy the chain of evidence that linked the contraband to his client and to prevent its use to establish his client's guilt.

On August 24, 1966 a man armed with a sawed-off shotgun robbed the Varina Branch of the Bank of Virginia of $7,583. Included in the currency taken were $10 bills known as "bait money," the serial numbers of which had been recorded.

On August 26, 1966 Charles Richard Cook rented safety deposit box 14 at a branch of the Richmond National Bank. Later in the day Cook was interviewed at his home by agents of the Federal Bureau of Investigation, who obtained $348 from him. Cook telephoned Ryder, who had represented him in civil litigation. Ryder came to the house and advised the agents that he represented Cook. He said that if Cook were not to be placed under arrest, he intended to take him to his office for an interview. The agents left. Cook insisted to Ryder that he had not robbed the bank. He told Ryder that he had won the money, which the agents had taken from him, in a crap game. At this time Ryder believed Cook.

Later that afternoon Ryder telephoned one of the agents and asked whether any of the bills obtained from Cook had been identified as a part of the money taken in the bank robbery. The agent told him that some bills had been identified. Ryder made inquiries about the number of bills taken and their denominations. The agent declined to give him specific information but indicated that several of the bills were recorded as bait money.

The next morning, Saturday, August 27, 1966, Ryder conferred with Cook again. He urged Cook to tell the truth, and Cook answered that a man, whose name he would not divulge, offered him $500 on the day of the robbery to put a package in a bank lockbox. Ryder did not believe this story. Ryder told Cook that if the government could trace the money in the box to him, it would be al-most conclusive evidence of his guilt. He knew that Cook was under surveillance and he suspected that Cook might try to dispose of the money.

That afternoon Ryder telephoned a former officer of the Richmond Bar Association to discuss his course of action. He had known this attorney for many years and respected his judgment. The lawyer was at home and had no library available to him when Ryder telephoned. In their casual conversation Ryder told what he knew about the case, omitting names. He explained that he thought he would take the money from Cook's safety deposit box and place it in a box in his own name. This, he believed, would prevent Cook from attempting to dispose of the money. The lawyers thought that eventually F.B.I. agents would locate the money and that since it was in Ryder's possession, he could claim a privilege and thus effectively exclude it from evidence. This would prevent the government from linking Ryder's client with the bait money and would also destroy any presumption of guilt that might exist arising out of the client's exclusive possession of the evidence.

Ryder testified:

"I had sense enough to know, one, at that time that apparently the F.B.I. did have the serial numbers on the bills. I had sense enough to know, from many, many years of experience in this court and in working with the F.B.I. and, in fact, in directing the F.B.I. on some occasions, to know that eventually the bank—that the F.B.I. would find that money if I left that money in the bank. There was no doubt in my mind that eventually they would find it. The only thing I could think of to do was to get the money out of Mr. Cook's possession. * * * [T]he idea was that I assumed that if anybody tried to go into a safety deposit box in my name, the bank officials would notify me and that I would get an opportunity to come in this court and argue a question of whether or not they could use that money as evidence."

The lawyers discussed and rejected alternatives, including having a third party get the money. At the conclusion of the conversation Ryder was advised, "Don't do it surreptitiously and to be sure that you let your client know that it is going back to the rightful owners."

On Monday morning Ryder asked Cook to come by his office. He prepared a power of attorney, which Cook signed:

"KNOW YOU ALL MEN BY THESE PRESENTS, that I, CHARLES RICHARD COOK do hereby make, constitute and appoint, R. R. RYDER as my Attorney at Law and in fact and do authorize my said Attorney to enter a safety deposit box rented by me at the Richmond National Bank and Trust Company, 2604 Hull Street, Richmond, Virginia, said box requiring Mosler Key Number 30 to open the same and I further authorize the said Attorney to remove the contents of the said box and so dispose of the said contents as he sees fit and I direct the officials of the said bank to cooperate with my said attorney towards the accomplishment of this my stated purpose."

Ryder did not follow the advice he had received on Saturday. He did not let his client know the money was going back to the rightful owners. He testified about his omission:

"I prepared it myself and told Mr. Cook to sign it. In the power of attorney, I did not specifically say that Mr. Cook authorized me to deliver that money to the appropriate authorities at any time because for a number of reasons. One, in representing a man under these circumstances, you've got to keep the man's confidence, but I also put in that power of attorney that Mr. Cook authorized me to dispose of that money as I saw fit, and the reason for that being that I was going to turn the money over to the proper authorities at whatever time I deemed that it wouldn't hurt Mr. Cook."

Ryder took the power of attorney which Cook had signed to the Richmond National Bank. He rented box 13 in his name with his office address, presented the power of attorney, entered Cook's box, took both boxes into a booth, where he found a bag of money and a sawed-off shotgun in Cook's box. The box also contained miscellaneous items which are not pertinent to this proceeding. He transferred the contents of Cook's box to his own and returned the boxes to the vault. He left the bank, and neither he nor Cook returned.

Ryder testified that he had some slight hesitation about the propriety of what he was doing. Within a half-hour after he left the bank, he talked to a retired judge and distinguished professor of law. He told this person that he wanted to discuss something in confidence. Ryder then stated that he represented a man suspected of bank robbery. The judge recalled the main part of the conversation:

"* * * And that he had received from this client, under a power of attorney, a sum [of] money which he, Mr. Ryder, suspected was proceeds of the robbery, although he didn't know it, but he had a suspicion that it was; that he had placed this money in a safety deposit vault at a bank; that he had received it with the intention of returning it to the rightful owner after the case against his client had been finally disposed of one way or the other; that he considered that he had received it under the privilege of attorney and client and that he wanted responsible people in the community to know of that fact and that he was telling me in confidence of that as one of these people that he wanted to know of it.

"Q. Did he say anything to you about a sawed-off shotgun?

A. I don't recall. If Mr. Ryder says he did, I would not deny it, but I do not recall it, because the—my main attention in what he was saying was certainly drawn to the fact that the money was involved, but I just cannot answer the question emphatically, but if Mr. Ryder says he told me, why, I certainly wouldn't deny it."

Ryder testified that he told about the shotgun. The judge also testified that Ryder certainly would not have been under the impression that he—the judge—thought that he was guilty of unethical conduct.

The same day Ryder also talked with other prominent persons in Richmond—a judge of a court of record and an attorney for the Commonwealth. Again, he stated that what he intended to say was confidential. He related the circumstances and was advised that a lawyer could not receive the property and if he had received it he could not retain possession of it.

On September 7, 1966 Cook was indicted for robbing the Varina Branch of the Bank of Virginia. A bench warrant was issued and the next day Ryder represented Cook at a bond hearing. Cook was identified as the robber by employees of the bank. He was released on bond. Cook was arraigned on a plea of not guilty on September 9, 1966.

On September 12, 1966 F.B.I. agents procured search warrants for Cook's and Ryder's safety deposit boxes in the Richmond National Bank. They found Cook's box empty. In Ryder's box they discovered $5,920 of the $7,583 taken in the bank robbery and the sawed-off shotgun used in the robbery.

On September 23, 1966 Ryder filed a motion to suppress the money obtained from Cook by the agents on August 26, 1966. The motion did not involve items taken from Ryder's safety deposit box. The motion came on to be heard October 6, 1966. Ryder called Cook as a witness for examination on matters limited to the motion to suppress. The court called to Ryder's attention papers pertaining to the search of the safety deposit boxes. Ryder moved for a continuance, stating that he intended to file a motion with respect to the seizure of the contents of the lockbox.

On October 14, 1966 the three judges of this court removed Ryder as an attorney for Cook; suspended him from practice before the court until further order; referred the matter to the United States Attorney, who was requested to file charges within five days; set the matter for hearing November 11, 1966; and granted Ryder leave to move for vacation or modification of its order pending hearing.

The United States Attorney charged Ryder with violations of Canons 15 and 32 of the Canons of Professional Ethics of the Virginia State Bar. Ryder did not move for vacation or modification of the order, and the case was heard as scheduled by the court en banc. After the transcript was prepared and the case briefed, the court heard the argument of counsel on December 27, 1966.

At the outset, we reject the suggestion that Ryder did not know the money which he transferred from Cook's box to his was stolen. We find that on August 29 when Ryder opened Cook's box and saw a bag of money and a sawed-off shotgun, he then knew Cook was involved in the bank robbery and that the money was stolen. The evidence clearly establishes this. Ryder knew that the man who had robbed the bank used a sawed-off shotgun. He disbelieved Cook's story about the source of the money in the lockbox. He knew that some of the bills in Cook's possession were bait money.

Judge Learned Hand observed in United States v. Werner, 160 F.2d 438, 441 (2d Cir. 1947):

"The defendants ask us to distinguish between 'knowing' that goods are stolen and merely being put upon an inquiry which would have led to discovery; but they have misconceived the distinction which the decisions have made. The receivers of stolen goods almost never 'know' that they have been stolen, in the sense that they could testify to it in a court room."

Judge Hand then went on to say (160 F.2d 442):

"But that the jury must find that the receiver did more than infer the theft from the circumstances has never been demanded, so far as we know; and to demand more would emasculate the statute * * *."

In Melson v. United States, 207 F.2d 558, 559 (4th Cir. 1953), the court said:

"It is well settled that knowledge that goods have been stolen may be inferred from circumstances that would convince a man of ordinary intelligence that this is the fact."

We also find that Ryder was not motivated solely by certain expectation the government would discover the contents of his lockbox. He believed discovery was probable. In this event he intended to argue to the court that the contents of his box could not be revealed, and even if the contents were identified, his possession made the stolen money and the shotgun inadmissible against his client. He also recognized that discovery was not inevitable. His intention in this event, we find, was to assist Cook by keeping the stolen money and the shotgun concealed in his lockbox until after the trial. His conversations, and the secrecy he enjoined, immediately after he put the money and the gun in his box, show that he realized the government might not find the property.

We accept his statement that he intended eventually to return the money to its rightful owner, but we pause to say that no attorney should ever place himself in such a position. Matters involving the possible termination of an attorney-client relationship, or possible subsequent proceedings in the event of an acquittal, are too delicate to permit such a practice.

██ We reject the argument that Ryder's conduct was no more than the exercise of the attorney-client privilege. The fact that Cook had not been arrested or indicted at the time Ryder took possession of the gun and money is immaterial. Cook was Ryder's client and was entitled to the protection of the lawyer-client privilege. Continental Oil Co. v. United States, 330 F.2d 347 (9th Cir. 1964).

Regardless of Cook's status, however, Ryder's conduct was not encompassed by the attorney-client privilege. A frequently quoted definition of the privilege is found in United States v. United Shoe Mach. Corp., 89 F.Supp. 357, 358 (D. Mass.1950):

"The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

The essentials of the privilege have been stated in 8 Wigmore, Evidence § 2292 (McNaughton Rev.1961):

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."

It was Ryder, not his client, who took the initiative in transferring the incriminating possession of the stolen money and the shotgun from Cook. Ryder's conduct went far beyond the receipt and retention of a confidential communication from his client. Counsel for Ryder conceded, at the time of argument, that the acts of Ryder were not within the attorney-client privilege.

Ryder's reliance upon United States v. Judson, 322 F.2d 460 (9th Cir. 1963) and Schwimmer v. United States, 232 F. 2d 855 (8th Cir. 1956), cert. denied 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956), is unfounded. In both of these cases subpoenas duces tecum were served upon lawyers requiring them to produce papers deposited with them by their clients. *Judson* turns upon the application of the

Fifth Amendment. The court said at 322 F.2d 466:

"Clearly, if the taxpayer in this case * * * had been subpoenaed and directed to produce the documents in question, he could have properly refused. The government concedes this. But instead of closeting himself with his myriad tax data drawn up around him, the taxpayer retained counsel. Quite predictably, in the course of the ensuing attorney-client relationship the pertinent records were turned over to the attorney. The government would have us hold that the taxpayer walked into his attorney's office unquestionably shielded with the Amendment's protection, and walked out with something less.

\*　\*　\*　\*　\*　\*

"The thrust of the Fifth Amendment is that 'prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law.' United States v. White, supra, 322 U.S. [694,] at 698 [64 S.Ct. 1248, 88 L.Ed. 1542]."

Schwimmer (232 F.2d 855) concerned papers which had been contained in a lawyer's files. The lawyer had discontinued his practice and had stored the papers with a manufacturing company. The court recognized that the lawyer had standing to quash a subpoena duces tecum. The case turned upon the Fourth Amendment. The court recognized that production of one's private books and papers by subpoena duces tecum for use against him in a criminal proceeding is prohibited by the Amendment. The fact that the papers were in the constructive possession of the attorney did not remove them from its protection. The court also recognized that the attorney had sufficient interest in the papers to be permitted to take a part in the proceedings to determine their admissibility.

Not all papers in a lawyer's file are immune. The rule is summarized in McMormick, Evidence, § 93 at p. 188 (1954):

"[I]f a document would be subject to an order for production if it were in the hands of a client, it would be equally subject if it is in the hands of an attorney."

The basic difficulty with Ryder's reliance upon *Judson* and *Schwimmer* is that this proceeding is not concerned with the concealment of Cook's papers or other articles of an evidentiary nature. Neither Cook nor his attorney could be compelled to produce merely evidentiary articles nor could such articles be seized in a legal search. Cf. Hayden v. Warden, 363 F.2d 647 (4th Cir. 1966), cert. granted, 385 U.S. 926, 87 S.Ct. 290, 17 L.Ed.2d 210 (1966) (No. 480, 1966 Term). In Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947), Mr. Chief Justice Vinson said:

"This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime."

Ryder, an experienced criminal attorney, recognized and acted upon the fact that the gun and money were subject to seizure while in the possession of Cook.

In Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933), Mr. Justice Cardozo expressed a dictum, which is apt to the aid Ryder gave Cook:

"We turn to the precedents in the search for an analogy, and the search is not in vain. There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."

Securities & Exchange Comm. v. Harrison, 80 F.Supp. 226, 230 (D.D.C.1948), aff'd, 87 U.S.App.D.C. 232, 184 F.2d 691 (1950), judgment order vacated as moot, 340 U.S. 908, 71 S.Ct. 290, 95 L.Ed. 656 (1951), describes the privilege and its limitations:

"That privilege has long been recognized as a very proper and necessary one to insure full and complete revelation by a person to an attorney to the end that the client may be properly advised, represented, and, in appropriate cases, defended by that attorney. To subject such revelations to exposure by the testimonial process would inevitably lead to concealments which would impair proper representation and thus interfere with proper administration of justice. While it relates to the rights of an individual, it is nonetheless recognized, as so many of our fundamental rights are, as essentially in the public interest. This privilege has, however, never been intended to be, and should not be, a cloak or shield for the perpetration of a crime or fraudulent wrong doing. One who consults an attorney to secure aid or assistance in the perpetration of a future crime or fraudulent wrong doing is not consulting that attorney for the legitimate purposes which are protected by the privilege. If, therefore, it be shown by evidence other than the disclosure of the communications between client and attorney that aid or assistance is being sought for the perpetration of crime or fraudulent wrongdoing, there is no immunity to the testimonial process respecting such communications."

In Clark v. State, 159 Tex.Cr.R. 187, 261 S.W.2d 339 (1953), cert. denied, reh. denied sub nom. Clark v. Texas, 346 U.S. 855, 905, 74 S.Ct. 69, 98 L.Ed. 369 (1953), a lawyer's advice to get rid of a gun used to commit a murder was admissible in evidence. The court observed the conversation was not within the realm of legitimate professional conduct and employment. Cf. Comment, Fruits of the Attorney-Client Privilege: Incriminating Evidence and Conflicting Duties, 3 Duquesne U.L.Rev. 239, 247 (1965), which criticizes *Clark*. In argument, it was generally conceded that Ryder could have been required to testify in the prosecution of Cook as to the transfer of the contents of the lockbox.

We conclude that Ryder violated Canons 15 and 32. His conduct is not sanctioned by Canons 5 or 37. In providing for the adoption and enforcement by the Supreme Court of Appeals of Virginia of rules and regulations prescribing a code of ethics to govern professional conduct of attorneys, the General Assembly of Virginia stated that "the Supreme Court of Appeals shall not adopt or promulgate rules or regulations prescribing a code of ethics * * * [for] attorneys * * * which shall be inconsistent with any statute * * *." Va.Acts of Assembly 1940, ch. 314 at 508 (Mar. 28, 1940).

Pursuant to this legislation, the Supreme Court of Appeals of Virginia adopted the Canons of Professional Ethics, published in 205 Va. 1012. The Court followed the Canons of the American Bar Association. Pertinent to this case are Canons, 5, 15, 32 and 37:

"5. *The Defense or Prosecution of Those Accused of Crime.* It is the right of the lawyer to undertake the defense of a person accused of crime, regardless of his personal opinion as to the guilt of the accused; otherwise innocent persons, victims only of suspicious circumstances, might be denied proper defense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law.

"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible.

\*     \*     \*     \*     \*     \*

"15. *How Far a Lawyer May Go in Supporting a Client's Cause.* Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class and to deprive the profession of that full measure of public esteem and confidence which belongs to the proper discharge of its duties than does the false claim, often set up by the unscrupulous in defense of questionable transactions, that it is the duty of the lawyer to do whatever may enable him to succeed in winning his client's cause.

"It is improper for a lawyer to assert in argument his personal belief in his client's innocence or in the justice of his cause.

"The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense. But it is steadfastly to be borne in mind that the great trust of the lawyer is to be performed within and not without the bounds of the law. The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client.

\* \* \* \* \* \*

"32. *The Lawyer's Duty In Its Last Analysis.* No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive, nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation. Correspondingly, he advances the honor of his profession and the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law. He must also observe and advise his client to observe the statute law, though until a statute shall have been construed and interpreted by competent adjudication, he is free and is entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent. But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen.

\* \* \* \* \* \*

"37. *Confidence of a Client.* It is the duty of a lawyer to preserve his client's confidences. This duty outlast the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.

If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent

the act or protect those against whom it is threatened."

The money in Cook's box belonged to the Bank of Virginia. The law did not authorize Cook to conceal this money or withhold it from the bank. His larceny was a continuing offense. Cook had no title or property interest in the money that he lawfully could pass to Ryder. The Act of Assembly authorizing the promulgation of the Canons of Ethics in Virginia forbids inconsistency with § 18.1–107 Code of Virginia, 1950, which provides:

> "If any person buy or receive from another person, or aid in concealing, any stolen goods or other thing, knowing the same to have been stolen, he shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender be not convicted."

No canon of ethics or law permitted Ryder to conceal from the Bank of Virginia its money to gain his client's acquittal.

Cook's possession of the sawed-off shotgun was illegal. 26 U.S.C. § 5851. Ryder could not lawfully receive the gun from Cook to assist Cook to avoid conviction of robbery. Cook had never mentioned the shotgun to Ryder. When Ryder discovered it in Cook's box, he took possession of it to hinder the government in the prosecution of its case, and he intended not to reveal it pending trial unless the government discovered it and a court compelled its production. No statute or canon of ethics authorized Ryder to take possession of the gun for this purpose.

Canon 15 states in part:

> " * * * [T]he great trust of the lawyer is to be performed within and not without the bounds of law. The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client."

In helping Cook to conceal the shotgun and stolen money, Ryder acted without the bounds of law. He allowed the office of attorney to be used in violation of law. The scheme which he devised was a deceptive, legalistic subterfuge—rightfully denounced by the canon as chicane.

Ryder also violated Canon 32. He rendered Cook a service involving deception and disloyalty to the law. He intended that his actions should remove from Cook exclusive possession of stolen money, and thus destroy an evidentiary presumption. His service in taking possession of the shotgun and money, with the intention of retaining them until after the trial, unless discovered by the government, merits the "stern and just condemnation" the canon prescribes.

Ryder's testimony that he intended to have the court rule on the admissibility of the evidence and the extent of the lawyer-client privilege does not afford justification for his action. He intended to do this only if the government discovered the shotgun and stolen money in his lockbox. If the government did not discover it, he had no intention of submitting any legal question about it to the court. If there were no discovery, he would continue to conceal the shotgun and money for Cook's benefit pending trial.

Ryder's action is not justified because he thought he was acting in the best interests of his client. To allow the individual lawyer's belief to determine the standards of professional conduct will in time reduce the ethics of the profession to the practices of the most unscrupulous. Moreover, Ryder knew that the law against concealing stolen property and the law forbidding receipt and possession of a sawed-off shotgun contain no exemptions for a lawyer who takes possession with the intent of protecting a criminal from the consequences of his crime.

Canon 15 warns against the reasoning urged in support of Ryder:

> "Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class and to deprive the profession of that full measure of esteem and confidence which belongs to the proper discharge of its

duties than does the false claim, often set up by the unscrupulous in defense of questionable transactions, that it is the duty of the lawyer to do whatever may enable him to succeed in winning his client's cause."

■ We find it difficult to accept the argument that Ryder's action is excusable because if the government found Cook's box, Ryder's would easily be found, and if the government failed to find both Cook's and Ryder's boxes, no more harm would be done than if the agents failed to find only Cook's. Cook's concealment of the items in his box cannot be cited to excuse Ryder. Cook's conduct is not the measure of Ryder's ethics. The conduct of a lawyer should be above reproach. Concealment of the stolen money and the sawed-off shotgun to secure Cook's acquittal was wrong whether the property was in Cook's or Ryder's possession.

There is much to be said, however, for mitigation of the discipline to be imposed. Ryder intended to return the bank's money after his client was tried. He consulted reputable persons before and after he placed the property in his lockbox, although he did not precisely follow their advice. Were it not for these facts, we would deem proper his permanent exclusion from practice before this court. In view of the mitigating circumstances, he will be suspended from practice in this court for eighteen months effective October 14, 1966.

■ Finally, we agree with the amicus curiæ and Ryder that in disciplinary proceedings a show cause order generally is preferable to an *ex parte* suspension with leave to apply for reinstatement pending a full hearing. Cf. Bradley v. Fisher, 13 Wall. 335, 80 U.S. 335, 20 L.Ed. 646 (1871) and Laughlin v. Wheat, 68 App. D.C. 190, 95 F.2d 101 (1937). The difficulties inherent in Ryder's continued representation of Cook required the course followed here. When it became apparent from the affidavits for the search warrants and as a result of the hearing on October 6, 1966 that it was Ryder who held concealed in his posses-

sion the stolen money and the sawed-off shotgun alleged by the government to be connected with the crime and that he intended to continue his representation of Cook, the three judges of this court decided they should act. In the order suspending Ryder and setting a date for hearing, Ryder was afforded an opportunity for an immediate hearing upon motion. We conclude that considering both the substance and the procedure of this case, Ryder was not denied due process of law nor has he suffered prejudice.