**UNITED STATES of America,**

v.

**Tyrone SMALLWOOD, Defendant.**

No. 1:03CR245.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 14, 2005.

Brian D. Miller, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Lana Mariee Manitta, Martin & Arif, Springfield, VA, Frank Salvato, Alexandria, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Investigators hired by court-appointed defense counsel seek $6,759 in payment for services rendered in this case, but certain of the investigators' conduct in the course of the investigation raises a question as to whether the payment request should be denied in whole or in part. Specifically, the investigators recorded a telephone interview with a critical prosecution inmate-witness, without the knowledge or consent of that witness or his appointed counsel. At issue, therefore, is whether an investigator hired by a lawyer must abide by an attorney's ethical obligations in Virginia not to (i) communicate with a person known to be represented by counsel regarding the subject of the representation, or (ii) electronically record a conversation with a third party without the full knowledge and consent of the other party.

### I.[1]

Tyrone Smallwood and Thomas Edward Smith, Jr., members of a drug trafficking conspiracy, were tried for various crimes, including murder while engaged in drug trafficking.[2] Before the trial began, a co-conspirator, Anthony Brown, pled guilty to aiding and abetting that murder and be-

---

1. The facts recited here are derived from the parties' submissions and a hearing held on February 21, 2005. *See United States v. Smallwood*, Case No. 1:03cr245 (E.D.Va. Feb. 21, 2005) (Hearing Transcript).

2. For a detailed statement of the facts underlying the subject drug conspiracy and murder, *see United States v. Smallwood*, 293 F.Supp.2d 631 (E.D.Va.2003) (denying defendants' motion to transfer venue and to dismiss firearms charge and deferring ruling on defendants' motion to suppress statements), and *United States v. Smallwood*, 299 F.Supp.2d 578 (E.D.Va.2004) (granting in part and denying in part government's motion in limine to admit statements of decedent on day of murder).

came a cooperating witness for the government.[3] Importantly, Brown was prepared to testify at trial that he drove with defendants to an alley entrance, and then observed from the parked car at the alley entrance as the defendants led the victim down the alley and murdered him.

To prepare for trial, defense counsel for Smallwood, Frank Salvato and Lana Manitta,[4] appropriately obtained authorization, *ex parte*, to retain private investigators to conduct a pre-trial investigation.[5] Pursuant to that authorization, they retained the investigative services of Hickey, Miller & Bailey, Inc. (hereinafter "Investigators" or "Investigator," as appropriate). Shortly before trial, Manitta learned that Christopher Dyer, her client in an unrelated case who was then an inmate at the Northern Neck Regional Jail, knew Brown, who was also incarcerated at Northern Neck at the time. Dyer told Manitta that Brown had approached him with offers to sell information that Dyer might use to testify as a government witness, and thus receive a reduced sentence. Concerned that Brown might attempt to offer false testimony against Smallwood, Salvato and Manitta made the decision to send the Investigators to speak with Dyer. Because Manitta represented Dyer at the time, this direction to the Investigators was not improper.

Acting on this direction from Salvato and Manitta, the Investigators traveled to the Northern Neck Regional Jail where they met with Dyer. From Dyer the Investigators learned that Brown had repeatedly tried to sell to other inmates information concerning a variety of criminal activity that might be used to win government assistance in obtaining a sentence reduction.[6] Indeed, according to Dyer, Brown had repeatedly urged Dyer to purchase such information for this purpose. Before the Investigators left, Dyer inquired what he should tell Brown in the event Brown were to continue to urge Dyer to purchase such information. Because the Investigators wanted to "keep things open," as they put it, they told Dyer to delay. Specifically, they suggested that Dyer tell Brown that he needed to talk with his "uncle" who might provide Dyer with money to pay for the information. The Investigators also gave Dyer a phone number so Dyer could contact them, if necessary.

In view of this conversation with Dyer, the Investigators decided to contact Salvato and Manitta as soon as possible to discuss an appropriate course of action. Yet, before they could do so, at approximately

---

3. *See United States v. Brown,* Criminal No. 03–612–A (E.D.Va. Dec. 30, 2003) (Plea Agreement).

4. Because this prosecution, when commenced, included the potential for the imposition of capital punishment, two very competent and experienced attorneys, Salvato and Manitta, were appointed to represent defendant. *See* 18 U.S.C. § 3005 (requiring that defendant indicted for treason or a capital crime, upon his request, be assigned two counsel to represent him). And settled authority makes clear that the appointment of two attorneys should continue even if, as here, the government elects not to seek the death penalty in the event of conviction. *See*

*United States v. Boone,* 245 F.3d 352, 358 (4th Cir.2001) (holding that § 3005 establishes a right to two attorneys where the death penalty may be imposed, even if the government does not ultimately seek the death penalty) (citing *United States v. Watson,* 496 F.2d 1125 (4th Cir.1973)).

5. *See* 18 U.S.C. § 3006A(e)(1) (upon request by *ex parte* application, a court may authorize counsel to obtain investigative, expert, or other services necessary for adequate representation when a defendant is financially unable to do so himself).

6. The record does not reflect the precise nature, content, or accuracy of this information.

8:15 p.m. that evening, Dyer called one of the Investigators in his office. The Investigator claims he did not expect the call, but that as soon as he learned that Dyer was the caller, he activated an electronic device to record the conversation.[7] The Investigator did not notify Dyer that the call was being recorded.[8] Near the beginning of the call, Dyer explained that Brown was present with him and wished to speak directly with the Investigator, apparently under the mistaken impression that the Investigator was Dyer's "uncle." Significantly, the Investigator did not disclose his true identity as an investigator working for Smallwood, nor did he say anything to correct Brown's mistaken impression that the person on the line, *i.e.* the Investigator, was Dyer's uncle. In the course of the recorded conversation, Brown explained that he had information regarding a number of murders that might prove helpful to Dyer in obtaining a sentence reduction. The Investigator and Brown discussed information regarding two murders and the method of payment to Brown for this information. At the end of the call, the Investigator disclosed his true name, but still did not reveal to Brown that he was an investigator working on behalf of Smallwood or that he was not Dyer's uncle. Nor did he correct Brown's impression that he was willing to pay

Brown for the information on Dyer's behalf. Importantly, it is clear that at no time prior to this telephone call did Salvato or Manitta direct the Investigator to speak with Brown or to tape record the telephone conversation; that decision was made solely by the Investigator.

Following the recorded telephone conversation, the Investigators contacted Salvato and Manitta to explain what had occurred with respect to their contact with Brown and the recorded telephone call. Although counsel believed that further discussions with Brown might yield additional information helpful to Smallwood, they directed the Investigators to have no further contact with Brown. It appears that both Brown and Dyer thereafter attempted repeatedly to call the Investigators, who, acting on counsel's instructions, did not return the calls.

After learning of the recorded telephone conversation between Brown and the Investigator, Salvato and Manitta promptly called a representative of the local chapter of the Virginia State Bar[9] to seek advice on the appropriate course of action they should follow in the circumstances. Because this was an unrecorded telephone contact, no written record exists concerning precisely what information Salvato and Manitta provided to the local Bar repre-

---

7.  Although it appears that the recorder was activated quite near the beginning of the call, the transcript does not include the opening lines of the call.

8.  The Investigator noted that phone calls are routinely recorded at the Northern Neck Regional Jail and that he merely activated his recorder so that he would have his own record of the conversation.

9.  Although the record is unclear in this respect, Salvato explained at the hearing that this representative was the "local bar counsel or bar prosecutor" of the local chapter of the Virginia State Bar, whom Salvato knew from having previously served with him on the

local Ethics Committee. Notably, the record does not reflect that Salvato and Manitta attempted to call the Virginia State Bar Legal Ethics Hotline, established by the Virginia State Bar to provide informal ethics opinions over the telephone. *See* Virginia State Bar, Legal Ethics Opinions, *at* http://www.vsb. org/profguides/opinions.html (last visited Apr. 13, 2005). Nor does the record reflect that they requested a written Legal Ethics Opinion from the Virginia State Bar Standing Committee on Legal Ethics. *See id.;* Va. Sup.Ct. R., Part 6, § IV, ¶ 10 (establishing rules for promulgation of Legal Ethics Opinions), *available at* http://www.vsb.org/profguides /org.pdf (last visited Apr. 13, 2005).

sentative or what advice the representative offered. Nonetheless, it appears that after being advised of the essential facts, the Bar representative acknowledged the troubled provenance of the tape recorded telephone conversation, but went on to advise Salvato and Manitta that because their first obligation was to represent their client zealously, they were required to use the tape at trial and to use it in a manner that maximized its advantage to their client. Salvato and Manitta decided to follow this advice [10] and thus decided not to give notice to Brown's counsel or the Court of the existence and circumstances of the recorded conversation between the Investigator and Brown or of their intention to offer the tape into evidence at trial. Instead, Salvato and Manitta sought to introduce the recording in the midst of the trial in an attempt to impeach Brown's credibility by showing that Brown had attempted to sell information and encouraged others to commit perjury to obtain reduced sentences. Brown's counsel, taken entirely by surprise, was quite upset that the Investigators had spoken with Brown and recorded the conversation without Brown's counsel's knowledge or consent. Further, Brown's counsel strenuously objected to Smallwood's counsel's failure to notify him of the recording before seeking to introduce it at trial. This attempt to introduce the tape into evidence also prompted immediate objections from the government. In the end, Smallwood, by counsel, was permitted to impeach Brown by cross-examining him about his efforts to sell information to other inmates, but the tape and transcript of the call itself were not admitted into evidence. *See United States v. Smallwood,* Case No. 03cr245 (E.D.Va. Feb. 17, 2004) (Trial Transcript).[11] In so ruling, the Court made clear that no opinion was expressed with respect to the propriety of the Investigator's communication with Brown or trial counsel's failure to disclose the recording promptly upon learning of its existence.

On July 22, 2004, the Investigators submitted a voucher requesting payment in the amount of $6759.23 for investigative services performed on behalf of Smallwood. Given the concern that at least a portion of the investigation had been conducted in violation of appropriate ethical standards, the request was held in abeyance pending the submission of briefs and a hearing on the matter. On February 22, 2005, a hearing was held at which the parties, including the Investigators, were afforded the opportunity to clarify the underlying facts. The matter is now ripe for disposition.

## II.

### A. Communication with a Represented Person

The question whether it was proper for the Investigator to communicate with Brown without the consent of Brown's counsel properly divides into two parts. It is first appropriate to consider whether the Investigator's communications with Brown, if conducted by a lawyer, would have been proper. This is so because if a lawyer might properly have communicated with Brown as the Investigator did here, it is unnecessary to reach the second question, which is whether an investigator or other

---

**10.** Of course, the local Bar representative's opinion, given informally and over the telephone, was not binding and thus, counsel were under no obligation to follow it. History reflects that such advice may miss the mark. *See, e.g., In re Ryder,* 263 F.Supp. 360, 362–63 (E.D.Va.1967) (advice given by local bar leaders was found to be neither controlling nor in every case entirely accurate).

**11.** Brown admitted at trial that he had attempted to sell information to other inmates and was thoroughly cross-examined on this point.

assistant employed by a lawyer to assist in investigating or preparing a case must, in doing so, abide by a lawyer's ethical obligations regarding communications with represented parties. Put differently, the second question is whether a lawyer's investigator or assistant may communicate with a represented party when a lawyer may not ethically do so.

■ These questions are appropriately answered by reference to the Virginia Rules of Professional Conduct.[12] And these Rules make unmistakably clear that a lawyer may not ethically contact or direct others to contact a known represented party about the subject of that representation without the knowledge or consent of that party's counsel. *See* Rule 4.2, Va. R. Prof'l Conduct. Thus, Rule 4.2 states unambiguously that,

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Rule 4.2, Va. R. Prof'l Conduct.

■ Significantly, the Rule's underlying rationale is not limited to parties in a formal proceeding, but rather extends to communications with any represented individual when the communications involve the subject of the representation. As comment 5a to Rule 4.2 makes clear,

> Concerns regarding the need to protect uncounselled persons against the wiles of opposing counsel and preserving the attorney-client relationship may also be involved *where a person is a target of a criminal investigation,* knows this, and has retained counsel to receive advice with respect to the investigation.

Rule 4.2 cmt. 5a, Va. R. Prof'l Conduct (emphasis added). Moreover, the same concerns arise where, as here, "a *third party' witness* furnishes testimony in an investigation or proceeding and although not a formal party, has decided to retain counsel to receive advice with respect thereto." *Id.* (emphasis added); *see also United States v. Franklin,* 177 F.Supp.2d 459 (E.D.Va.2001) (disqualifying defense attorney for communications with government witness without his counsel's consent). And notably, a violation of Rule 4.2 occurs even where the represented party consents to the communication. *See Franklin,* 177 F.Supp.2d at 467 ("[Uncounselled] consent in no way mitigates whether a violation of Rule 4.2 has occurred."). Because such consent is uncounselled, it cannot qualify as the knowing and intelligent consent required for the Rule. In sum, then, a lawyer may not communicate with a person known to be represented about a matter relevant to the representation without the consent of the person's lawyer.

■ Given these settled principles, it is clear that Salvato, Manitta or any other lawyer would have violated Rule 4.2 had he or she communicated with Brown, as did the Investigator here, concerning any aspect of the *Smallwood* case without the consent of Brown's lawyer. Here, Salvato and Manitta, as well as the Investigators, knew Brown was represented by counsel in connection with his testimony against Smith and Smallwood. Moreover, they also knew that Brown's lawyer had not consented to any communication, nor would he be likely to do so. This is particularly so given the real risk that such an interview might ultimately prove harmful to Brown's efforts to win a Rule 35 reduc-

---

**12.** *See* Local Rule 57.4(1), E.D. Va. Local Crim. R. (with one exception not relevant here, ethical standards relating to criminal law practice in the Eastern District of Virginia are governed by the Virginia Rules of Professional Conduct as published in the version effective January 1, 2000).

tion in his sentence in exchange for his testimony as a government witness in the *Smallwood* case. Thus, although Brown and the Investigator discussed the sale of information in cases unrelated to the *Smallwood* case, it is plain that the discussion was aimed at collecting information to impeach Brown's credibility as a witness testifying against Smallwood and was therefore related to the "subject of the representation." Rule 4.2, Va. R. Prof'l Conduct. Accordingly, this communication, if conducted by a lawyer, would have violated Rule 4.2.

The Investigator pointed out at the hearing that Brown, not the Investigator, initiated the recorded telephone conversation and that the call took the Investigator by surprise. Yet, this is ultimately of no consequence, for what matters under the Rule is not which party initiated the communication, but that the communication occurred. Nor does it matter that the Investigator was surprised by the call; his surprise did not compel him to accept the call and participate in the communication; he could, of course, quite easily have declined to speak with Brown. The Investigator did not terminate the conversation once Brown came on the line, nor did he inform Brown that he was an investigator working on Smallwood's behalf. Instead, he permitted Brown to remain under the mistaken impression that the Investigator was a relative of Dyer interested in aiding Dyer by purchasing information from Brown so that Dyer could obtain government assistance in securing a sentence reduction.[13] It follows, therefore, that this communication, if conducted by a lawyer, would have constituted a breach of the lawyer's professional ethics, subjecting the lawyer to discipline.

■ Given that a lawyer plainly could not ethically have communicated with Brown as the Investigators did here, it is necessary to consider whether the Investigators, as the lawyers' assistants and agents, may be held to the same ethical standard even though they are not members of the Bar. The answer to this question is readily apparent. Simply put, a lawyer should not be able to avoid ethical strictures that bind lawyers by using an assistant to engage in the proscribed conduct. In other words, in general, what a lawyer may not ethically do, his investigators and other assistants may not ethically do in the lawyer's stead. Were this not so, a lawyer might easily circumvent many ethical obligations through the use of an assistant or investigator who, given only a hint, cunningly perceives that his employer's cause can be aided by engaging in conduct that might be ethically forbidden to the lawyer.[14] Further, it would give

---

**13.** It is worth noting that even had Brown knowingly consented to a conversation with Smallwood's lawyer, without the knowledge and consent of Brown's counsel, any such communication still would have been improper. *See Franklin,* 177 F.Supp.2d at 467–68.

**14.** Such a possibility calls to mind Henry II's infamous words, in reference to the Archbishop of Canterbury, Thomas à Becket, his friend and principal antagonist: "Will no one rid me of this turbulent priest?" *See* John Gillingham, *The Angevins, in The Lives of the Kings & Queens of England* 54 (Antonia Fraser ed.1995); *see also* Will Durant, *The Age of Faith: A History of Medieval Civilization— Christian, Islamic, and Judaic—from Constan-* *tine to Dante: A.D. 325–1300* 669–672 (1950); John Bartlett, *Bartlett's Familiar Quotations* 127:2 (Justin Kaplan ed., 17 ed.2002). As we know, four of Henry's knights overheard this remark and obligingly murdered Becket in Canterbury Cathedral. But as we also know, Henry paid dearly for his wayward words. Becket was swiftly canonized and the murder aroused such great public sentiment against Henry that he was forced to perform penance, including (i) a pilgrimage to Canterbury, walking the last three miles on bare bleeding feet and (ii) allowing the monks to scourge him while he lay prostrate at Becket's tomb. And, not to be omitted from this telling is that Henry's assistants—his knight assassins—received their due, too; they were executed.

unscrupulous lawyers an incentive to provide those in their charge with only limited ethical direction. For these reasons, the Virginia Rules of Professional Conduct plainly contemplate that a lawyer's investigators or assistants, when acting on the lawyer's behalf, must abide by the ethical obligations of the legal profession as the Rules establish an affirmative duty for a lawyer to "make reasonable efforts to ensure that [his nonlawyer assistants'] conduct is compatible with the professional obligations of the lawyer." *See* Rule 5.3, Va. R. Prof'l Conduct (2000). To be sure, a lawyer must, of necessity, often act through and with the help of assistants who are nonlawyers in order to accomplish the lawyer's work, and thus the prudential concerns and ethical bounds that constrain the legal profession are of equal importance whether a lawyer acts directly or through the efforts of assistants or investigators.[15] In general, therefore, a lawyer's assistants or investigators must abide by the lawyer's ethical obligations when they act on behalf of the lawyer.

██ Nor is there any reason to depart from this general rule in the case of Rule 4.2. A represented party is equally susceptible to manipulation in the best interests of one's own client by a lawyer's assistant or investigator as by a lawyer.[16] Thus, it is sensible to conclude that a lawyer's assistants and investigators, when acting on behalf of the lawyer, must comply with Rule 4.2's commands for communications with represented parties. In this case, therefore, the Investigators' communication with Brown, a represented party, was improper as it concerned a subject relevant to Brown's testimony against Smallwood and took place without the knowledge or consent of Brown's counsel.

## B. Tape Recording of Telephone Conversation

Whether the Investigators acted properly by recording the telephone conversation with Brown is again a question that is appropriately divided into two parts. The first issue is whether a lawyer who spoke with Brown, via telephone, as the Investigators did here, properly could have recorded that telephone conversation without Brown's consent. And second, if a lawyer could not ethically have recorded the conversation, it is appropriate to consider whether the Investigators may be held to the same standard.

██ Analysis properly begins with the recognition that in Virginia it is not a criminal offense for a person to record a conversation where the person "is a party to the communication or one of the parties to the communication has given prior consent" to the recording. Va.Code § 19.2–62(B)(2). In other words, in Virginia,

---

**15.** Of course, most assistants, unless lawyers themselves or members of some other professional association, cannot themselves be held accountable for unethical behavior unless it also amounts to criminal conduct. Nonetheless, the fact that corrective measures cannot usually be implemented directly against these assistants does not mean that their conduct is beyond regulation. In certain circumstances, as here, it may be possible to sanction such assistants and investigators by reducing their compensation.

**16.** *See also United States v. Chavez,* 902 F.2d 259, 266 (4th Cir.1990) (stating that "[b]oth government lawyers and government agents must be aware and respectful of the ethical guideline that forbids *ex parte* contacts with a represented defendant."); *Upjohn Co. v. Aetna Casualty & Sur. Co.,* 768 F.Supp. 1186, 1213–14 (W.D.Mich.1990) (finding that ethical no-contact rule applies to nonlawyers hired by lawyers to collect evidence from adverse party); Restatement (Third) of the Law Governing Lawyers § 99 cmt. b (2000) ("The [no-contact rule] also applies to nonlawyer employees and other agents of a lawyer, such as an investigator.").

there is no criminal prohibition against recording a telephone conversation *provided* one of the parties to the conversation has consented to the recording. Yet, .this does not end the analysis, for as the Supreme Court of Virginia has noted, "conduct may be unethical, measured by the minimum requirements of the Code of Professional Responsibility, even if it is not unlawful." *Gunter v. Virginia State Bar,* 238 Va. 617, 621, 385 S.E.2d 597 (1989). And while a lawyer's recording of a telephone conversation with the knowledge and consent of one, but not all, parties to the conversation is not a crime in Virginia, the Supreme Court of Virginia nonetheless considers this to be "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of Rule 8.4 of the Virginia Rules of Professional Conduct. *Id.* (applying precursor to ·Rule 8.4). As the Supreme Court reasoned, this sensible conclusion follows because the surreptitious recording of a conversation is an " 'underhand practice' designed to 'ensnare' an opponent." *Id.* Thus, to record or advise others to record a conversation without the consent of the other party is "more than a

departure from the standards of fairness and candor which characterize the traditions of professionalism." *Id.* This principle applies · with equal force whether a lawyer recorded the conversation himself or encouraged another to do so. *Id.* (disciplining lawyer for directing client to install wiretap on client's home without his wife's consent).[17] In this case, the Investigators recorded the conversation with Brown without his. knowledge or consent to the recording. Indeed, Brown did not even know the Investigators' true identity. Thus, if a lawyer had recorded the conversation with Brown, as the Investigators did here, it plainly would have violated Rule 8.4.[18]

▮ Again, there is no reason to depart from the general rule that a lawyer's assistants and investigators are required to abide by the lawyer's ethical obligations when acting on the lawyer's behalf. As plainly seen by the attempt to introduce this recording in this case, such recordings taken by a lawyer's investigators are equally capable of " 'ensnar[ing]' an opponent" as are recordings taken by a

17. Worth noting is the existence of two pertinent Legal Ethics Opinions of the Virginia State Bar Standing Committee on Legal Ethics.· In one opinion, the Standing Committee on Legal Ethics opined that a lawyer, or an agent acting at his direction, may record a conversation with the knowledge and consent of only one party, if he is engaged in a criminal investigation or housing discrimination investigation. *See* Standing Committee on Legal Ethics, Legal Ethics Opinion 1738 (2000) (summarizing Virginia law regarding surreptitious recordings by attorneys). ·While it might be argued that the Investigators were engaged in a "criminal investigation". when they recorded the conversation with Brown, a subsequent Legal Ethics Opinion appears to narrow the exception for "criminal investigations" to those ·involved in "law enforcement." *See* Standing Committee on Legal Ethics, Legal Ethics Opinion 1765 (2000).

In any event, it is important to note that these Opinions are not binding authority. *See*

Va. Sup.Ct. R., Part 6, § IV, ¶ 10(c)(vi) ("Any [Advisory Opinion of the Committee on Legal Ethics] expresses the judgment of the Committee and is advisory only. It shall have no legal effect and is not binding on any judicial or administrative tribunal."). It is the Supreme Court of Virginia's teaching in *Gunter* on this issue that is binding and this teaching is‸that a lawyer may not ethically record a conversation without the consent of all parties to the conversation. *See Gunter,* 385 S.E.2d at 600.

18. The fact that the call may have been recorded by Northern Neck Regional Jail as a matter of routine is of no consequence. The ethical obligation is not rooted in notions of the duped party's reasonable expectation of privacy, but rather in the ethical obligation to avoid conduct involving dishonesty, fraud, deceit, or misrepresentation. Rule 8.4, Va. R. Prof'l Conduct.

lawyer. 385 S.E.2d at 600. Thus, a lawyer's assistants and investigators may not ethically record a telephone conversation without the knowledge and consent of all parties to that conversation. It follows, therefore, that the recording of the conversation with Brown was improper.

In reaching these conclusions—that both the conversation with Brown itself and the recording of that conversation were improper—the purpose is not to impugn the motives or integrity of any of the parties involved, but rather to clarify the appropriate ethical guidelines for the future. In sum, then, the following conclusions and lessons may be drawn from this episode:

(i) just as a lawyer may not communicate with a represented party about the subject of the representation without the consent of that person's lawyer, neither may a lawyer's investigator or other assistant do so;

(ii) a lawyer's investigator or other assistant, like a lawyer, may not tape record conversations with the knowledge or consent of only one party to the conversation but without the knowledge and consent of other parties;

(iii) the lawyers in this case did not engage in any improper conduct nor did they knowingly authorize the Investigators to do so. At most, the lawyers may be faulted for failing to anticipate that events would occur that would require them to instruct the Investigators regarding their ethical obligations. Arguably, these events were not reasonably foreseeable in the circumstances. Nonetheless, the facts of this case are a useful reminder that lawyers are obligated to take affirmative steps to instruct and supervise their investigators or other assistants to ensure that they are aware of, and ultimately comply with, the lawyers' ethical obligations; in other words, it is incumbent upon an attorney to take all reasonable steps necessary to avoid inadvertent deception or unethical conduct carried out by his assistants or investigators. *See* Rule 5.3(b), Va. R. Prof'l Conduct ("[A] lawyer having direct supervisory authority over [a] nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer.");[19]

(iv) an investigator or other assistant has an affirmative duty to learn and abide by a lawyer's ethical obligations; he may not simply claim ignorance of these duties and proceed to act with impunity; instead, investigators or other assistants should seek direction from their lawyer-employers when presented with areas of ethical ambiguity or uncertainty.

In the end, it is clear that neither the lawyers nor the Investigators knowingly engaged in any improper conduct. And significantly, the Investigators' itemized statement reflects that the interview with Brown was a comparatively small portion of the services the Investigators performed on Smallwood's behalf. According-

**19.** While Salvato and Manitta concluded that their duty of client loyalty required not only that they use the recording, but that they not disclose it until the midst of trial, it would have been preferable for Salvato and Manitta to notify Brown's counsel and the Court prior to the trial's commencement of the recording's existence and of their intention to introduce it. The concern that earlier disclosure of the recording might have caused Brown to tailor his testimony does not outweigh the importance of avoiding any inference of ratification of the Investigators' conduct. *See* Rule 5.3, Va. R. Prof'l Conduct ("[A] lawyer shall be responsible for conduct of [a nonlawyer employed or retained by or associated with the lawyer] that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved . . . .").

ly, it is appropriate to grant the Investigators' request for payment in its entirety with the caution that in the future, a lawyer's investigators and other assistants should be cautious to observe the ethical strictures required of both members of the legal profession and those they employ.

An appropriate Order will issue.