Gilbert F. THORNTON, Appellant,

v.

UNITED STATES, Appellee.

No. 7840.

District of Columbia Court of Appeals.

Argued Oct. 24, 1974.

Decided May 19, 1976.

Jerry C. Straus, Washington, D. C., with whom Edward M. Fogarty, Washington, D. C., was on the briefs, both appointed by this court, for appellant.

Justin D. Simon, Asst. U.S. Atty., Washington, D. C., with whom Earl J. Silbert, U.S. Atty., and John A. Terry, James F. McMullin, and John T. Kotelly, Asst. U.S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, GALLAGHER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted of felony murder, D.C.Code 1973, § 22–2401, armed robbery, *id.* §§ 22–2901 and 22–3202, and assault with a dangerous weapon, *id.* § 22–502. He contends that he was deprived of his constitutional right to effective assistance of counsel, and he was denied due process of law through an impermissibly suggestive out-of-court identification. We affirm.

## I

The convictions arose out of an incident in the Fox and Hounds Lounge and its kitchen, which was shared by the adjacent Trio Restaurant. Shortly before 5:00 p. m. on March 6, 1973, Richard Mara, bartender-manager of the Fox and Hounds, entered the kitchen. Stephen Hart, the cook for the Trio, was working there. Mara, who had just cashed a check, stopped to chat with Hart on his return to the Fox and Hounds. Mara was "sort of counting some money".

. Two men entered the nearly empty lounge.[1] One of them, later identified by Hart as appellant, went into the kitchen carrying a sawed-off shotgun. The other, armed with a pistol, remained in the lounge.

Appellant, seeing Mara counting his money, demanded that he "hand it over". As appellant reached to take the money, the shotgun discharged, hitting the wall. Both Hart and Mara then tried to gain control of the gun. During the struggle, appellant struck Mara on the head with the shotgun, causing a wound which bled profusely. As the three men emerged from the kitchen into the lounge, entangled in struggle, appellant called to his accomplice to "shoot". Hart, unaware to that point of the presence of anyone else, turned. The man with a handgun approached and fired, striking Hart in the left arm. As Hart fled back toward the kitchen, he heard a second shot. Hart later testified that the second attacker shot Mara.

The two armed men fled the Fox and Hounds. The first police officer on the scene called for an ambulance and broadcast a radio run for the robbery and shooting. Officers Robert Stewart and John Burnett monitored that radio run. Meanwhile, a city trash collector was working in an alley near the Fox and Hounds. He saw two men run down the alley, throwing something into a barrel as they went by, which he found to be a sawed-off shotgun, still smoking. The trash collector approached Officer Burnett, handed him the shotgun, and described the two men. The descriptions were relayed to Officer Stewart, and he and his partner began a search of the vicinity.

Less than four blocks from the shooting, Officer Stewart, in casual clothes and an unmarked car, saw appellant. He was walking slowly and hesitantly, looking

---

1. The only other occupant of the Fox and Hounds at that time was a customer, Raymond Vandam. He testified that he had paid little attention to the two new entrants until he heard the word "robbery" shouted. He then turned and glanced at the two figures. Before he could see any more, a shot was fired. Vandam immediately went down to the floor where he remained face down for the remainder of the episode.

about, and breathing hard. The officer drove past appellant, maintaining observation in his rearview mirror. A marked police car came into the area, whereupon appellant left the sidewalk and entered a church courtyard. He lay down behind a row of bushes and attempted to cover himself with leaves. Officer Stewart stopped the car and, with his partner, approached appellant. The officers frisked appellant and questioned him briefly. Seeing a fresh blood stain on appellant's pants, the officers checked his leg for wounds. Finding none, they handcuffed him and turned him over to other officers.

Appellant was taken to the Fox and Hounds for identification purposes. By that time, Hart and Mara had been taken to a hospital, where Mara died from his bullet wound. Appellant was asked to accompany the police to the hospital. Once there, he was viewed and immediately identified by Hart. At the time of the confrontation appellant was not in handcuffs, but was wearing his bloodstained trousers.

## II

Appellant's case was scheduled for trial on Monday, September 10. The government voluntarily supplied defense counsel with its Jencks Act material in advance. On the Friday evening before trial, defense counsel visited appellant at the jail, taking the Jencks material with him. Until that time, as later characterized by defense counsel, appellant's version of the incident was predicated on the contention that he had gone to the Fox and Hounds "for the purpose of gaining back money that he paid for a component set." Faced with the government's evidence, however, appellant decided to alter his story totally, switching to an alibi theory.

When the case was reached for trial, defense counsel requested a bench confer-

ence and moved to withdraw "for moral ethical reasons."[2] When the court pressed for greater specificity, counsel stated:

[M]y client now decides he is going to state another and completely different story than what he told me before, which I know enough to be true. In presenting it to the Court in this case I feel that I would be violating the canons of ethics.

Having thus explained the basis for his ethical quandary, counsel felt that the trial judge had come to share his problem. He stated to the court:

It makes it doubly difficult because I have not explained—it would in no way impinge on Your Honor's integrity but it could well affect Your Honor's sentencing, that the testimony in this case is not true.

The court then said: "In essence, what you are suggesting is that you would be relieved and I certify the case to another judge?" Defense counsel responded: "Yes, Your Honor."

A recess was taken, following which the court imposed a novel solution. Without ruling upon defense counsel's motion for leave to withdraw, it certified the case to a second judge. However, the first judge already had instructed the second judge not to inquire into counsel's reasons for seeking to withdraw. When the case reached the second judge, defense counsel again requested permission to withdraw. The government objected, in part because the introduction of new counsel would have necessitated a continuance, and several of the 24 government witnesses who were present to testify had traveled a long way to do so. Being given no valid reason for granting leave to withdraw, the second judge denied the motion. The trial proceeded with defense counsel's ethical problem undiminished. Throughout, he adhered to the suggestion which had been made by the first judge to follow the recommenda-

---

2. Defense counsel had notified the prosecutor of his dilemma on Friday night, telephoning him as soon as he got home from the jail.

tions of the relevant American Bar Association Standards.[3]

After denying the motion for leave to withdraw, the court considered a pretrial motion which had been filed pro se by appellant.[4] In this motion, appellant sought dismissal of the indictment on the basis of an unduly suggestive identification. Defense counsel opined to the court that the motion as such was meritless, but said that if it were treated as a motion to suppress testimony related to the hospital identification it should be heard "out of an abundance of caution . . . to protect the rights of my client." The court heard testimony and argument on the circumstances of the hospital identification, and denied the motion.

The government presented its evidence, following which appellant remained determined to testify. Counsel advised the judge that appellant would be taking the stand against his advice and that he intended to ask appellant only to tell "his story". The following colloquy then occurred between appellant and his attorney:

Q. Now, on the afternoon of March 6th, 1973, would you tell the ladies and gentlemen of the jury exactly where you were?

A. The afternoon of March 6th?

Q. Yes. Tell them where you were and what you did.

A. I left the house about 3:00 o'clock, riding a bicycle. I was going downtown toward Georgetown. I got downtown to 16th and Massachusetts Avenue. I [was] stopped by a man who asked me for my bike. He wanted my bike. He pushed me off my bike and hit me in my nose. And after he hit me in my nose, he pulled me off my bike. I sat on the curb for a little while and my nose was bleeding.

Q. What happened after that?

A. I got up and walked up the street. And I was walking up the street, and that is when the police stopped me.

Whatever credibility such testimony had was shattered by the later introduction of

---

3. Standard 7.7 of the ABA Standards Relating to the Prosecution Function and the Defense Function (Approved Draft, 1971) reads as follows:
   7.7 Testimony by the defendant.
   (a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely.
   (b) If, before trial, the defendant insists that he will take the stand to testify falsely, the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary.
   (c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, it is unprofessional conduct for the lawyer to lend his aid to the perjury or use the perjured testimony. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not recite or rely upon the false testimony in his closing argument.

4. Appellant had filed three pro se motions. Of the three, two were withdrawn through counsel without argument. The first sought dismissal of the indictment on the ground that appellant had not been accorded a preliminary hearing within the ten-day period prescribed by Super.Ct.Cr.R. 5(c)(2). Defense counsel pointed out that the limitation had been waived to permit a psychiatric evaluation of appellant's competency. The second motion, similarly withdrawn, broadly requested suppression of all evidence, "tangible or intangible".

appellant's prior inconsistent statements.[5] Throughout, defense counsel followed the course delineated in ABA Standard 7.7(c). Closing argument was limited to a meticulous attack upon the government's evidence; counsel was silent as to defendant's alibi testimony.

### III

■ Appellant bases his general claim of deprivation of effective assistance of counsel on both the actions of the trial court and the performance of his attorney.[6] He first claims that the rulings surrounding trial counsel's motion to withdraw constitute reversible error. With the benefit of reflective hindsight (a luxury not enjoyed by the successive trial judges), we conclude that error was committed. However, we do not agree that reversal on this ground is required. The procedural flaws alone would not justify reversal; such a result would be mandated only if there had been a deprivation of appellant's right to counsel as a result of those flaws.

■ Two errors were committed in dealing with the motion.[7] The first judge erred in directing the second judge to refrain from inquiring into the grounds for the motion.[8] The resolution of a motion affecting such a basic constitutional right, without any examination of the reasons therefor, is prima facie improper. When a question of the continued effective assistance of counsel is voiced, the court "then has a duty to inquire into [its] basis". *Brown v. United States*, 105 U.S.App.D.C. 77, 83, 264 F.2d 363, 369 (en banc) (Burger, J., concurring), *cert. denied*, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959). While the trial court has broad discretionary authority over motions to appoint new counsel and requests by counsel to

---

5. When appellant was arrested, he told one officer that the blood on his pants came from an injury to his leg. Examination revealed no injury at all. Later, a court order was obtained to test a sample of appellant's blood. He then told another officer that there was no point in testing his blood, since the blood on the pants was not his.

6. Appellant also contends that reversible error was committed when the first trial judge directed counsel to proceed in accordance with ABA Standard 7.7(c). We find no order to that effect, but rather a mere suggestion. Even had there been an order, however, our disposition of the claim of ineffective assistance of counsel would turn on the effect of such an order on the actual performance of counsel during trial. *See Angarano v. United States*, D.C.App., 312 A.2d 295 (1973), *petition for reconsideration denied*, 329 A.2d 453 (1974) (en banc).

7. The mere certification of the case to another judge did not constitute error. However, the first judge should have ruled dispositively on the motion, since it was presented to him in full. *See Brown v. United States*, 105 U.S.App.D.C. 77, 83, 264 F.2d 363, 369 (en banc) (Burger, J., concurring), *cert. denied*, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959). *Brown* concerned a defendant's request to have a new attorney appointed, while in this case the request emanated from the attorney himself. This distinction, however, is not significant, since at issue is the constitutional right to assistance of counsel. Judge (now Chief Justice) Burger, concurring, stated in *Brown* that

> when, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter.

Judge Burger felt that such a situation compelled not only a disposition, but an informed disposition. We agree with that exposition of the proper procedure when a nonfrivolous question concerning assistance of counsel is raised at trial.

8. Fearing a recreation of what he felt was an unacceptable situation and believing that ABA Standard 7.7 supported his approach, the trial judge apparently viewed this as his only available course of action. Following the recess, the first judge stated that he had spoken with the second judge and had told him that defense counsel

> would make a request to withdraw from the case in general terms. I asked—I told him that he could grant that request or deny that request, as he sees fit, but that whatever he does, he should not inquire further into your reasons because otherwise . . . he would be in the same dilemma I am in.
> I didn't tell him what your reasons were. I simply told him that after you make your request to withdraw he should either grant it or deny it without inquiring further.

withdraw, such authority properly may be exercised only on an informed basis. *Id.* at 83, 264 F.2d at 369 (Burger, J., concurring); *see McKoy v. United States,* D.C.App., 263 A.2d 645, 648 (1970).

██ Thus not only did the first judge err in directing the second judge to refrain from ascertaining the specific grounds for counsel's motion to withdraw, but the second judge erred in following that direction.[9] The trial court is required "to ascertain the *basis* . . . and then to rule on the *reasons* rather on a naked request . . . ." *Brown v. United States, supra,* 105 U.S.App.D.C. at 83, 264 F.2d at 369 (Burger, J., concurring); *see McKoy v. United States, supra,* at 648.

Appellant's primary challenge on the effectiveness question is leveled not at the court's pretrial rulings, but at the actual performance of defense counsel. Preliminarily, we emphasize the heavy burden of proving prejudice which an appellant bears in urging a claim of ineffective assistance of counsel to this court. The wide range of legitimate trial tactics, the scope of permissible legal judgments, and the stress generated by a criminal trial all combine to complicate the review of the conduct of defense counsel at trial. Cognizant of these considerations, the Circuit Court of Appeals aptly has set forth what we agree is the appropriate standard:

The methodology implicit in allowing reversal of convictions for error of defense counsel has many troublesome elements. A defense lawyer, as a legitimate tactic, takes certain action that he considers to be in the best interest of his client. Declining to cross-examine or to fully cross-examine an adverse witness is a common example. Then, on appeal, at the urging of a newly appointed appellate counsel, whose appointment only for purposes of the appeal insulates him from responsibility for the decisions of trial counsel, a panel of the appellate court would second guess the trial lawyers, speculate about what evidence might have been produced and conclude that the conviction of the accused should be reversed, not for judicial error nor for error of the prosecution, but for the claimed error of the *accused's* trial lawyer, *i. e.,* the court would speculate that evidence might have been presented more favorably to the accused, and then surmise that the evidence would have gone so far as to influence the jury to acquit. Because of the inherent hazards to the administration of justice of ordering reversals on such grounds, reversal should never be based upon the good faith tactics [or decisions] of defense lawyers except upon the clearest proof of actual prejudice. [*United States v. Clayborne,* 166 U.S.App.D.C. 140, 146, 509 F.2d 473, 479 (1974).]

Appellate counsel claims first that defense counsel failed to take any pretrial action on his client's behalf, despite what appellant now claims was an obvious need. Specifically, appellate counsel cites three instances in support of his contention that defense counsel lacked diligence in his pretrial preparation and advocacy. First, he challenges counsel's decision not to file any pretrial motions. Second, he claims counsel was unprepared to argue appellant's pro se motions, particularly the motion which was treated as one to suppress the out-of-court identification testimony.

9. Having been given no explanation for trial counsel's request to withdraw, the second trial judge saw no justification for granting it. Defense counsel indicated his lengthy association with the case and his extensive contact with appellant. He also informed the court that he was retained, rather than appointed, counsel. Forced to decide defense counsel's motion on less than an adequate basis, the court's denial of the motion was reasonable. Our task on appeal is to evaluate the effect of that ruling on appellant's constitutional right to counsel. Since we conclude that trial counsel rendered satisfactory representation to appellant, the denial of the motion for leave to withdraw does not call for reversal.

Third, he cites counsel's disclaimer of support for the merits of appellant's pro se motion to suppress the hospital identification testimony.

We find no deprivation of the assistance of counsel in any of these charges, viewed either singly or in concert. It is true that counsel filed no pretrial motions; however, this was the result of reasoned decisions on his part. He was fully prepared and intimately acquainted with the details of his case. Counsel stated to the second trial judge during the discussion of appellant's pro se motions that he had carefully considered the merits of possible pretrial motions, but had decided against them in the exercise of his professional judgment.[10] Where counsel is prepared to defend his client, and considers but declines to make certain pretrial motions, mere allegations that the assistance was ineffective because he "failed" to make them are insufficient to justify reversal. *See Martin v. United States*, 101 U.S.App.D.C. 329, 330, 248 F.2d 651, 652 (1957). While defense counsel's evaluations were correct, irrespective of that fact one claiming ineffective assistance must charge more than mere errors in judgment or tactics. *United States v. Hammonds*, 138 U.S.App.D.C. 166, 170, 425 F.2d 597, 601 (1970); *see Turner v. Maryland*, 303 F.2d 507, 511 (4th Cir. 1962). Further, appellant's argument that counsel's desire

to withdraw obstructed the presentation of a full and vigorous defense through the submission of pretrial motions is without merit, since the basis for counsel's ethical conflict arose after he gave consideration to the advisability of filing such motions.

Secondly, appellant alleges that his trial counsel was unprepared to argue his pro se motions. The transcript leads us to conclude the opposite.[11] *Cf. Adams v. United States*, 95 U.S.App.D.C. 354, 356, 222 F.2d 45, 47 (1955). The pro se motion addressed to a critical element of the government's case, the identification at the hospital, was recast at the urging of defense counsel. As noted above, it was treated as a request to suppress the hospital identification as unduly suggestive.[12] This motion was vigorously argued by counsel. Defense counsel's salvaging of an otherwise meritless pro se motion and his argument to the court on the identification issue reveals a studied knowledge of the case, rather than the lack of preparation that appellant now argues.

Appellant additionally argues that counsel's acknowledgment, prior to the hearing on the motion, that he personally felt the facts were insufficient to support a motion to suppress the hospital identification, deprived appellant of his right to the full and unhampered representation of his attorney.[13] The record refutes this

10. After the restyled motion to suppress the identification testimony had been heard and denied, defense counsel stated:
    I would like it to be on the record that all of these motions were considered by myself. I do believe, under the Canons of Ethics, I also have an obligation not to burden the Court with frivolous motions.

11. As noted in footnote 4, *supra*, appellant filed three pro se motions. There is no indication that counsel was unprepared to argue either of the two motions which were withdrawn. His actual performance reflects that he had given them full consideration and that he was acting upon his client's directions when he withdrew them.

12. In his third motion, appellant sought to have the indictment dismissed on the ground

that it was based on an unlawful pretrial identification. Counsel correctly perceived that this was an insufficient basis for dismissal. *See United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Lester*, D.C.App., 318 A.2d 899, 900 (1974). Despite the fact that all of the pro se motions were untimely, counsel urged the court to take evidence and hear argument on the third motion as one to suppress testimony of that identification as unduly suggestive. The court assented to counsel's request, but thereafter denied the motion in its altered form on the merits.

13. Counsel had stated to the court:
    Once again, in my professional capacity as his attorney, my knowledge of the law as I read the law, not as I interpret it, because that's for the Court, but as I read it, I do

contention. Counsel's pursuit of the suppression motion was well above any level of minimal effectiveness. His actual performance cannot be subordinated to his view of the merits. It is the former, not the latter, which determines the effectiveness of the defense. Counsel's pretrial handling of the case was well within the bounds of effective assistance of counsel, and he demonstrated professional skill and commitment both to his client and to the court.

Appellant next maintains that counsel's performance at trial was so influenced by his belief that his client's changed story was not truthful, and by his consequent desire to disassociate himself from the perjurious testimony, that he failed to provide vigorous assistance to his client. Appellant cites both counsel's conduct surrounding the direct testimony of appellant and his avoidance of appellant's testimony in his summation to the jury.

Prior to putting on the defense, counsel advised the judge that appellant was taking the stand against his advice. Attorney and client then conferred again, and counsel announced that his client's intention was unaltered. The court itself then advised appellant of the possible adverse consequences of his testifying and of the protections he would be accorded should he exercise his privilege not to do so. Appellant remained undissuaded in his desire to testify. Counsel then stated to the court:

I advised my client not to get on the stand, and he was decided that he is going to take the stand. I have advised him, for the very reasons you have, that the government has to prove its case beyond a reasonable doubt. I will put him on the stand, and I will ask him to tell his story, and he will then state his story. I will then place on the stand the next witness, and we will go from there.

We have quoted above the initial portion of appellant's direct testimony; defense counsel thereafter assisted its full development by asking limited questions such as: "Then what happened?"

The second example of counsel's conduct raised in support of appellant's assertion is defense counsel's avoidance of appellant's alibi testimony in his final argument to the jury as recommended in ABA Standard 7.7(c).[14]

Appellant's argument, premised upon those two aspects of the trial, is that counsel failed to render effective assistance due to his desire to sever himself from what he believed was his client's deliberate (and counterproductive) reliance on an obviously fabricated story. Appellant maintains counsel's obligation to his client should have transcended any other, but that counsel had put his own interests first.

Appellant misconceives the professional advocate's function. Although he correctly delineates defense counsel's paramount duty, that duty must be met in conjunction with, rather than in opposition to, other professional obligations. Counsel does have an "obligation to defend with all his skill and energy, but he also has moral and ethical obligations to the court, embodied in the canons of ethics of the profession." *Mitchell v. United States*, 104 U.S.App.D.C. 57, 62, 259 F.2d 787, 792, *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958). The ethical strictures

---

not feel that there was a motion to suppress the identification in here, based on the law as I understand the law to be today. If that's wrong, of course, the Court of Appeals or Your Honor can certainly reverse my thinking and grant his motion.

14. While ABA Standard 7.7 was adopted after intensive consideration of the problems presented by a defendant's determination to testify in a way which defense counsel knows to be false, and its content is eminently sound, we do not feel that it is part of our role to adopt or formally sanction any of the standards. We firmly believe, however, that collectively they have made an extraordinary contribution to the criminal justice process.

under which an attorney acts forbid him to tender evidence or make statements which he knows to be false as a matter of fact. *Herbert v. United States*, D.C.App., 340 A.2d 802, 804 (1975); *United States v, Von Der Heide*, 169 F.Supp. 560, 567 (D.D.C.1959). *See also Johnson v. United States*, 124 U.S.App.D.C. 29, 31–32, 360 F.2d 844, 846–47 (1966). (Burger, J., concurring). His activities on behalf of his client are circumscribed by the principles and traditions of the profession and may not include advancing known false testimony in an effort to win his client's cause. *Herbert v. United States, supra; see also Carr v. State*, 180 So.2d 381 (Fla.App. 1965); *State v. Hilgemann*, 218 Ind. 572, 34 N.E.2d 129 (1941).

It is clear from defense counsel's colloquy with the first trial judge that counsel felt, based on his trial preparation, that the eleventh-hour change in appellant's story would result in his client's testifying falsely. Confronted with such a realization, counsel's obligation to both his client and the court is to use "all honorable means to see that justice is done," rather than to go to any lengths in an effort to see that a defendant is acquitted. *United States v. Clayborne, supra*, 166 U.S.App. D.C. at 145, 509 F.2d at 478. *See Mitchell v. United States, supra; United States v. Hammonds, supra.*

■ Given the government's strong evidence and appellant's transparent claim of alibi, it is difficult to perceive any prejudice appellant may have suffered from trial counsel's conduct of his defense. On the contrary, we think that under the circumstances, counsel performed meritoriously. His interrogation of witnesses was vigorous and skillful; he enabled appellant to submit his alibi story to the jury without himself significantly advancing such testimony; and he ably argued to the jury the subtleties and inferences related to the government's evidence without foisting upon the court a defense he knew to be

perjurious. We find no basis for reversal in counsel's conduct of the trial.

## IV

In the final challenge to his conviction, appellant asserts that he was denied due process of law when the surviving shooting victim was permitted to testify as to his identification of appellant at the hospital approximately one-half hour after the incident. Appellant contends that the confrontation took place in unduly suggestive circumstances which were impermissibly conducive to misidentification. *See Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Specifically, the circumstances alleged to create a defectively suggestive atmosphere were the length of the delay, the location, the presence of police officers (albeit in plain clothes), and the fact that appellant's pants had a noticeable bloodstain on them.

There is little doubt that some degree of suggestivity inheres in almost any such show-up. We have stressed, however, that the advantages of such a confrontation, while memories are fresh and as a reasonable part of an on-going investigation being conducted while the trail is still hot, often outweigh any inherent suggestibility. *Nichols v. United States*, D.C.App., 343 A.2d 336, 344–45 (1975); *Jones v. United States*, D.C.App., 277 A.2d 95, 97 (1971); *see also United States v. Washington*, 144 U.S.App.D.C. 338, 447 F.2d 308 (1970).

■ Our principal inquiry must be whether in the face of a suggestive confrontation procedure, the out-of-court identification was nevertheless reliable considering the totality of the circumstances. Where, as here, a prime suspect is located near the scene of the crime as a result of an uninterrupted search, the show-up is conducted as expeditiously as is reasonably possible (and appellant has had no opportunity to alter his personal appearance), and the witness' identification of his assailant was immediate and emphatic, we

conclude that the risk of mistaken identification was slight indeed. *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Russell v. United States*, 133 U.S.App.D.C. 77, 408 F.2d 1280, *cert. denied*, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); *see also United States v. Hines*, 147 U.S.App.D.C. 249, 455 F.2d 1317, *cert. denied*, 406 U.S. 969, 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). Appellant was deprived of no constitutional right when testimony concerning the identification was allowed at trial.

Affirmed.