Clayton J. MORRELL, Appellant,

v.

STATE of Alaska, Appellee.

No. 2790.

Supreme Court of Alaska.

March 3, 1978.

Lyle R. Carlson, Fairbanks, and Keith C. Monroe of Monroe & Riddet, Santa Ana, Cal., for appellant.

**1202**

Natalie Finn and David Shimek, Asst. Dist. Attys., Harry L. Davis, Dist. Atty., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

## OPINION

RABINOWITZ, Justice.

Clayton Morrell brings this appeal from his conviction, after trial by jury, on one count of kidnapping,[1] a single count of assault with intent to commit rape,[2] and eight counts of forcible rape.[3] All of these charges arose out of Morrell's 8-day encounter with 18-year-old Anne Elias in May 1975. After a presentence investigation had been conducted and the presentence report had been filed, Morrell was sentenced to life imprisonment on the kidnapping charge and to concurrent 10-year terms of imprisonment on each of the eight separate forcible rape convictions; Morrell's life imprisonment sentence was to run consecutively to the concurrent 10-year terms.[4] We affirm.

On May 5, 1975, Morrell offered a ride in his pickup truck to Anne Elias, who was hitchhiking from the University to her home outside Fairbanks. According to Elias' testimony at trial, she became Morrell's prisoner for 8 days. Morrell's version was that Elias voluntarily entered his vehicle on May 5 and voluntarily stayed with him for the next 8 days. Elias testified that Morrell, who was driving a green-blue pickup truck, picked her up as she was trying to hitch a ride home. Upon entering Morrell's vehicle, Elias testified she almost immediately noticed that the operating mechanism for the lock on the door on her side of the truck, which Morrell had told her to lock, was missing. Thus, she could not unlock the door. Furthermore, the window crank on her side of the vehicle was missing. Morrell testified that these defects in his truck had come about routinely and further he had not, or could not, repair the defects for one specific reason or another.

Elias testified that Morrell, despite her protests, drove to a campground outside Fairbanks. On the way to the campground, Morrell showed Elias a handgun that he was carrying. At the campground, Morrell fondled Elias for a short while and then he forced her into the back of the truck, where he unsuccessfully attempted to rape her. Blaming his failure on the cold, Morrell, who had taken Elias' clothes and put them in a plastic garbage bag in the back of the truck, gave Elias a nightgown which apparently had belonged to his ex-wife, and ordered her to get back into the cab of the truck.

After they had driven some distance from the campground, Morrell stopped the truck so he could tie and blindfold Elias. When they stopped a second time, Morrell had Elias get out of the truck. Her blindfold slipped enough for her to see that Morrell

1. AS 11.15.260 provides:

 A person who knowingly and without lawful *reason kidnaps, abducts or carries away* and holds for ransom, reward or other unlawful reason another person, except in the case of a minor by his parent, is punishable by imprisonment for a term of years or for life.

2. AS 11.15.160 reads:

 A person who assaults another with intent to kill, or to commit rape or robbery upon the person assaulted, is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year.

3. AS 11.15.120 stipulates, in part:

 A person who . . . has carnal knowledge of another person, forcibly and against the will of the other person . . . is guilty of rape.
 AS 11.15.130(c) provides that a person convicted of forcible rape is punishable by imprisonment in the penitentiary for not more than 20 years nor less than one year.

4. Morrell also was sentenced to a term of 5 years upon his conviction for the single count of *assault with intent to commit rape.* This term of imprisonment was made to run concurrently with the sentences the superior court imposed upon the forcible rape counts.

was leading her into a residence. Once in the residence he removed her blindfold. After he led her into a bedroom in the downstairs part of the house, Morrell untied Elias. A short while later, he raped Elias, who testified that she had resisted Morrell.

Morrell, on the other hand, testified that when he had reached an appropriate spot to let Elias out of his truck, she had been reluctant to leave. He suggested that she might like to go with him on his ride to the campground. At the campground, they simply talked for a long time and went for a short walk. Morrell further testified that when they neared Fairbanks on the drive from the campground, he told Elias that he had to be up early the next morning and therefore needed to let her off so he could go home and get some sleep. Morrell claimed at trial that Elias asked him if she could go home with him and when they arrived at his house, it was Elias who determined they would sleep together.

As for the succeeding week, Elias testified Morrell raped her at least once a day. She stated that when Morrell left the house, he would tie her to the bed and when he was at home, he would allow her to be untied. In addition, Elias testified that whenever Morrell left the house, he turned on the television set or the washer or both, apparently to block out Elias' screams, if she chose to scream.

At one point, Holland Butler, Morrell's landlord who lived in the other half of the duplex in which Morrell lived, came to Morrell's home. Butler testified that he did not notice anything unusual then or at any time during the week Elias was there. Elias testified that when Butler knocked on the door, Morrell told her not to say anything if she did not want to get hurt.

Elias testified that on the morning of May 13, Morrell, after raping her once more, told her to get dressed because he intended to release her. He drove her to a campground 30 miles from his home and released her. When Morrell stopped at a gas station that morning, Elias did not try to tell the attendant of her plight, even though Morrell left the truck while at the gas station.

After Morrell released her, Elias started walking toward Fairbanks, even though there were campers at the campground with whom she might have spoken. Later, Elias hitched a ride with Fred Shott despite the fact that he was alone, driving a pickup truck. After obtaining a second ride with another man, Elias reached her place of employment. A friend drove her home, and Elias told her friend about the encounter with Morrell.

Almost immediately after arriving home, Elias was interviewed by police officers who had been called by Elias' friend to report that Elias, who was being sought as a missing person, had returned. The officers took Elias to a doctor for examination. The doctor testified at trial that when he examined Elias, she had a bruise on her left hip and one on her left buttock. The bruises were recent, from two days to a week old. Elias also had bruises circling both ankles, bruises which could have been made by binding her ankles with rope.

Morrell testified that he had known Elias had been reported missing, but he thought that since she was an adult and was not wanted in connection with criminal conduct, she had a right to go wherever she pleased. Morrell explained Elias' ankle bruises by recounting that he had shown her the garters he had used while in the Marines to blouse his uniform trousers. Morrell said that Elias was particularly interested in the garters because she complained that she had difficulty keeping her socks up inside her boots.

Based on affidavits from Elias and from an investigator from the Alaska State Troopers assigned to the case, troopers obtained a warrant to search Morrell's home. Morrell's home had been located through information given by Elias, who had ascertained Morrell's name and phone number during her captivity and who could describe the exterior of Morrell's residence.

Officers executed the warrant in the afternoon of May 13, arresting Morrell and conducting a full search of the house. The search produced incriminating circumstantial evidence, such as magazines with address labels cut out, which Elias claimed had been given to her to read and which she believed had been cut up to keep her from learning where she was being held. Officers also found novels containing stories about kidnapping and captivity. They found cigarettes of the type Elias smoked. They also found packages of rope, clothes of the type Elias claimed to have been given to wear, food containers from a McDonald's restaurant, and a telephone extension which had been disconnected from the wall.

■ Morrell contends that the superior court erred in limiting his cross-examination of Elias about her drug usage and of Fred Shott about Elias' condition at the time he offered her a ride—following her alleged release by Morrell.

At the trial, Elias testified that on one occasion during the week she was held, she smoked the butt of a marijuana cigarette which she had been carrying when Morrell picked her up. Outside the presence of the jury, Elias further testified that she regularly smoked marijuana and had used LSD, "speed" and cocaine. The superior court limited the defense attorney's attempts to cross-examine Elias on her drug usage. Outside the hearing of the jury, Shott testified he had originally concluded that Elias was using drugs at the time he gave her a ride. Shott's opinion was based on what he considered to be abnormal behavior on Elias' part. The superior court limited defense counsel's cross-examination of Shott on this aspect of the latter's testimony.

Appellant recognizes that a witness may not be questioned as to drug use or addiction solely for the purpose of showing that the witness is unreliable. *Fields v. State,* 487 P.2d 831, 844 (Alaska 1971). However, Morrell asserts that such evidence is proper where, as here, the complaining witness and he had given conflicting reports as to the witness' drug use.[5]

■ As the state notes, Morrell's first justification for cross-examining Elias as to her drug use would constitute impeachment on a collateral matter. Elias and Morrell each testified about Elias' drug use while she was with Morrell. The superior court's ruling permitted Morrell's attorney to cross-examine Elias on this subject. The evidence excluded was her testimony about her drug use generally. Morrell wished to examine Elias as to this, apparently to prove that she was likely to be carrying with her more than the butt of a marijuana cigarette and, therefore, that his testimony as to her drug use while with him was more credible than that given by Elias. Even assuming this conclusion follows, *i. e.,* that Morrell's version of her drug use while with him was correct, Elias would have been impeached as to a collateral matter only. On this basis we conclude that the superior court's limitation was not erroneous.

■ Morrell also contends that the superior court erred in limiting cross-examination of Shott as to Elias' condition when he gave her a ride. Shott's testimony that he believed Elias was under the influence of drugs when he picked her up was, in effect, a lay opinion as to the cause of another person's physical state. Outside the presence of the jury, Shott explained that his

5. Further, Morrell argues that this court in *Fields v. State,* 487 P.2d 831, 846 (Alaska 1971), recognized that evidence of drug use is admissible to impeach statements by a witness that he or she has not used drugs. For this purpose, evidence which might otherwise be collateral is admissible.

Even assuming that *Fields* allows introduction of evidence of drug use—and not just addiction—to impeach statements by a witness that he or she has not used drugs, this exception appears inapplicable to the case at bar. *Fields* allows the statements of a witness who has testified about his nonuse of drugs to be impeached by a second witness through otherwise collateral impeachment testimony. The exception does not allow unlimited cross-examination to impeach a witness who denies drug use at a relevant time by showing that the witness used drugs at an irrelevant time.

opinion was based on what he perceived to be Elias' abnormal behavior while in his vehicle and the fact that he could smell no odor of alcohol. When asked in what manner Elias' behavior appeared abnormal to him, Shott testified that she responded slowly to his questions and she insisted on keeping a window open even though it was cold. As Shott himself volunteered, considering what Elias stated she had experienced, her behavior was normal. Further, Shott admitted that he had no exposure to drug use at all. Under these circumstances, Shott's opinion was without probative value and was properly excluded by the superior court.

■ In his next specification of error, Morrell contends that he was deprived of effective confrontation and of access to evidence potentially helpful to his defense by the superior court's refusal to permit examination of a journal kept by Anne Elias before, during and after the events in question. The superior court examined the journal in camera and turned over to Morrell's counsel the only page written by Elias during the time she was with Morrell.

Appellant takes the position that the procedure adopted by the trial court did not adequately protect his right to all evidence which might have been helpful to his defense because a judge presiding at trial is not sufficiently knowledgeable about the case—particularly the case for the defense—to determine what evidence could

aid the defense. Further, Morrell contends that under Criminal Rule 16(b) he is entitled to any written statements made by persons with knowledge of relevant facts.[6]

As a preliminary matter, the state points out that Criminal Rule 16(d)(5) expressly provides for excluding portions of material and disclosing the balance when the material contains both discoverable and non-discoverable information.[7] As the state notes, appellant does not contend that the superior court failed to supply all material written by Elias during her week with Morrell. Morrell apparently accepts the correctness of the superior court's determination of which material came within that category. However, Morrell asserts that the superior court should have permitted examination of Elias' entire journal—even those portions written before and after the eight-day incident.

We think the state's arguments are more persuasive as to the correct resolution of this issue. Nevertheless, we have examined the journal kept by Anne Elias for the purpose of ascertaining whether the superior court in fact failed to furnish relevant evidence helpful to the defense. The journal contains Elias' thoughts concerning her family's troubles and good times, her reactions to people and places, sketches, and transcriptions of song lyrics. The journal commences on January 27, 1975 and runs until July 31, 1975.[8]

On its face, the journal contains no passages which would tend to exculpate Mor-

---

6. Criminal Rule 16(b)(1)(i) provides:
 Except as is otherwise provided as to matters not subject to disclosure and protective orders, the prosecuting attorney shall disclose the following information within his possession or control to defense counsel and make available for inspection and copying:
 (i) The names and addresses of persons known by the government to have knowledge of relevant facts and their written or recorded statements or summaries of statements[.]

7. Criminal Rule 16(d)(5) reads:
 When some parts of certain material are discoverable under these rules, and other parts are not discoverable, as much of the material shall be disclosed as is consistent with this rule. Excision of certain material

and disclosure of the balance shall be preferred to withholding of the whole. Material excised pursuant to court order shall be sealed and preserved in the records of the court, and shall be made available to the supreme court in the event of an appeal.

8. Elias was with Morrell from May 5 until May 13, 1975. The only significant entry was on May 9, 1975. There she wrote "reading 'What will be the outcome' page 211." On the following line, she wrote "horseshoe reading." She then has written what appears to be a list of Tarot card readings. Two blank lines appear next followed by the word "waiting."
 Throughout Elias' journal there are references to Tarot cards, and Morrell testified that she read Tarot cards during her time with him.

rell or to impeach Elias. The only possible exculpatory reference which could be drawn from viewing the entire journal is that Elias suffered no traumatic experiences during the time in question because she did not mention them in the journal during or after their occurrence. On the other hand, we do not think this inference necessarily flows from Elias' omission.[9] We deem it significant, however, that defense counsel could have argued this inference to the jury under the procedure employed by the superior court regarding the journal. Since the superior court did not give defense counsel any portions of the journal which contained references to Morrell, the kidnapping, or the rapes, defense counsel could have assumed that no such explicit passages existed and could have argued that Elias had suffered no traumatic experiences because she wrote about none. Accordingly, we conclude that the superior court's in camera examination of the journal did not deprive appellant of "effective confrontation" or of access to evidence which was potentially helpful to his defense.

Morrell next contends that the superior court's decision to admit Exhibit XXX (the kidnapping plan) deprived him of a fair trial because the exhibit was obtained in a manner which infringed upon his right to effective assistance of counsel. After Morrell's arrest, Stephen Cline of the Public Defender Agency was appointed to represent Morrell. About a month after his appointment, on June 21, 1975, Cline received a telephone call from John Wagner, a friend of Morrell's who had been living in Morrell's home with Morrell's consent while Morrell awaited trial. At Morrell's suggestion, Wagner had cleaned out one of Morrell's vehicles and had found a legal pad on which had been written what appeared to be a kidnapping plan. Wagner asked Cline to come to the Morrell residence to see what he had found, and Cline did so.

Wagner asked Cline to take possession of the legal pad, which Cline also did. Shortly thereafter, Cline showed the papers to Morrell, who explained that he had sketched the plan in response to a television report of an earlier kidnapping in Fairbanks. A man named McCracken, who looked somewhat like Morrell and who drove a truck nearly identical to the one driven by Morrell, had been charged with the earlier kidnapping by the time Morrell was arrested. McCracken was also represented by the Public Defender Agency.

Cline, who was unsure what to do with the papers, contacted both the Alaska Bar Association and the American Bar Association for advice. The Ethics Committee of the Alaska Bar Association gave Cline an advisory opinion on the matter.[10]

The opinion advised Cline to return the papers to Wagner, to explain to Wagner the law on concealment of evidence, and to withdraw from the case if it later became obvious to Cline that a violation of ethical rules would result. Cline testified that he decided to return the legal pad to Wagner and to withdraw from the case at approximately the same time. However, he was not able to reach Wagner until a few days after July 31, when he was relieved by the court of his obligation to defend Morrell.

Cline testified that when he called to tell Wagner that he intended to return the pad, Wagner at first indicated that he did not want to take it back. Cline said that he helped Wagner arrange the transfer to the police because he wanted Wagner to be able to return to his pipeline job without delay but that he assisted with the transfer only after it became clear that Wagner intended to turn the evidence over to the police. Cline stated that following his conversation

9. Elias' writings after the incident are no more vague than those before the incident; her earlier writings did not present a clear picture of every significant event which happened to her each day.

10. On June 6, 1977, the Board of Governors of the Alaska Bar Association adopted Ethics Opinion 76–7.

with Wagner, he called the police. After ascertaining that Wagner had already requested police officers to come to his home to pick up some evidence, Cline requested that the dispatcher send one of the investigators assigned to the Morrell case. Cline was told that this would not be possible.

Wagner, on the other hand, testified that it had been Cline's idea to contact the police and that Cline had made the contact with the police to arrange the transfer. Both Cline and Wagner testified that Wagner had received the papers from Cline before turning them over to the troopers. Both men were at the Morrell home when the troopers arrived. The legal pad was resting on the hood of one of Morrell's vehicles, and Wagner initialed the pad before giving it to the troopers—indicating that it was he who was relinquishing custody of the papers to the troopers.

Cline testified that he had given Wagner a copy of the statute governing concealment of evidence. He apparently would not discuss the meaning or applicability of the statute with Wagner, however. He did testify that he specifically refused to give Wagner advice intended either to encourage or to discourage Wagner from turning the evidence over to the police. After denial of a motion to suppress, the papers and a handwriting analysis which linked Morrell to the papers were introduced in evidence at trial.

Appellant argues that the actions of his former attorney, Stephen Cline, deprived him of his right to effective assistance of counsel. He contends that when Cline obtained knowledge of and possession of the kidnapping plan, he had no affirmative duty to come forward with the evidence nor to assist Wagner in carrying out his decision to turn the evidence over to the police. Morrell further urges that the only way to have cured the denial of his right to counsel would have been to suppress the evidence obtained as a result. He maintains that the superior court's refusal to suppress the kidnapping plan deprived him of a fair trial.

As Morrell notes, authority in this area is surprisingly sparse. The existing authority seems to indicate, however, that a criminal defense attorney has an obligation to turn over to the prosecution physical evidence which comes into his possession, especially where the evidence comes into the attorney's possession through acts of a third party who is neither a client of the attorney nor an agent of a client. After turning over such evidence, an attorney may have either a right or a duty to remain silent as to the circumstances under which he obtained such evidence, but Morrell presents no authority which establishes that a criminal defendant whose attorney chooses to testify regarding to these matters is denied effective assistance of counsel.

Most of the decisions which discuss the situation in question involve bar disciplinary proceedings or contempt proceedings against the attorney for refusing to answer questions or to turn over evidence. In *State v. Olwell*, 64 Wash.2d 828, 394 P.2d 681 (1964), an order holding an attorney in contempt was reversed. The attorney had refused to comply with a subpoena duces tecum or answer questions at a coroner's inquest concerning a knife owned by a client. The Washington Supreme Court assumed for purposes of its decision that the attorney had obtained the knife in question as a result of a confidential communication with his client. The court stated that if the evidence had been obtained from a third party with whom no attorney-client relationship existed, communications concerning the knife would not be privileged.

The court in *Olwell* held that incriminating objects delivered to a criminal defense attorney by his client may be withheld by the attorney for a reasonable time to help the attorney prepare his case, and then they must be given to the prosecution. In addition, the court held that in order to protect the attorney-client relationship, the prosecution must not reveal the source of such evidence in the presence of the jury when it is introduced at trial. In discussing the

scope of this limited privilege, the court stated that to be protected as a privileged communication at all, the objects obtained by the attorney must have been delivered to the attorney by the client or have been acquired as a direct result of information communicated by the client and not merely have been obtained by the attorney while acting in that capacity for the client. In short, the *Olwell* rule requires a criminal defense attorney to turn over to the prosecution physical evidence that the attorney obtains from his client. This rule requires the defense attorney to avoid giving to investigating or prosecuting authorities any information concerning the source of the evidence or the manner in which it was obtained.[11] Finally, if the evidence is obtained from a non-client third party who is not acting as the client's agent, even the privilege to refuse to testify concerning the manner in which the evidence was obtained is inapplicable.[12]

In *People v. Lee*, 3 Cal.App.3d 514, 83 Cal.Rptr. 715 (1970), a district attorney obtained a search warrant for a pair of blood-stained shoes held by a judge pursuant to an agreement between the district attorney and the public defender. The judge and the two attorneys had agreed that the judge would hold the shoes pending a judicial determination of the proper disposition of the shoes. The public defender later testified at his client's trial that he had received the shoes from his client's wife and that he had delivered the shoes to the judge.

In both the *Lee* case and the case at bar a criminal defendant sought suppression of evidence delivered by his attorney to the authorities. The attorney obtained the evidence not from his client, but from a person with whom his client had a close personal relationship. Further, the attorney testified at the defendant's trial concerning the circumstances under which he obtained the evidence.

The court in *Lee* held that the attorney-client privilege does not give an attorney the right to withhold evidence. The court stated that it would be an abuse of a lawyer's duty of professional responsibility to knowingly take possession of and secrete instrumentalities of a crime. (The shoes were an instrumentality because the defendant had allegedly kicked the victim in the head.) In dicta, the court noted that although a client's delivery of evidence to the attorney may be privileged, the object itself does not become privileged. Thus, the California court held that seizure of the shoes by warrant was proper and that the objection to introduction of the shoes as evidence was properly overruled.

Further, the *Lee* court held that the attorney-client privilege did not cover the trial testimony of the attorney concerning the circumstances under which he obtained the shoes because he received the shoes from his client's wife rather than from his client. The court stated that the attorney-client privilege does not protect information which comes to an attorney unless the third

11. *See, e. g., Anderson v. State*, 297 So.2d 871 (Fla.App.1974). In *Anderson* the court adopted the rule announced by the Washington Supreme Court in *Olwell*; an order compelling an attorney to testify as to the name of a client who had given him stolen property was quashed. The attorney properly had given the stolen property to the police, and the Florida court held that the attorney-client privilege covered information concerning the attorney's acquisition of the property. The court stated that the attorney could not be compelled to testify on the matter and, in addition, that the prosecution could not introduce evidence at trial that the property had been obtained from the attorney.

*See also Dyas v. State*, 539 S.W.2d 251 (Ark. 1976). There an attorney testified at trial that he had turned over to investigating authorities two rings belonging to the murder victim which the attorney had obtained from the defendant's wife. On appeal, the defendant claimed that the trial court had erred in admitting this testimony. In rejecting this claim, the Arkansas court distinguished *Olwell*, stating that the *Olwell* privilege to refuse to testify concerning the source of incriminating evidence turned over to the prosecution does not apply when the evidence is obtained from a third party rather than from the client.

12. *People v. Lee*, 3 Cal.App.3d 514, 83 Cal.Rptr. 715 (1970).

party is acting as the client's agent. Although the attorney in *Lee* had obtained the shoes from his client's wife, the court found that she was not acting as the client's agent in turning the shoes over to the attorney.

Also of significance is *In re Ryder*, 263 F.Supp. 360 (E.D.Va.1967), *aff'd* 381 F.2d 713 (4th Cir. 1967). *Ryder* involved a proceeding to determine whether an attorney should be suspended or disbarred. The attorney had taken possession from his client of stolen money and a sawed-off shotgun, knowing that the money was stolen and that the gun had been used in an armed robbery. The attorney intended to retain the property until after his client's trial and then to return the money to its rightful owner.

The client in *Ryder* had put the money and the gun in his safe deposit box. The attorney, knowing that the money in the box was marked and disbelieving his client's story about how the client had acquired the money, went to the bank to transfer the money to his own safe deposit box. Upon opening the client's box, the attorney discovered the shotgun and transferred both the money and the gun to his own box. The court stated in dicta that the attorney's state of mind when he transferred the evidence demonstrated sufficient knowledge to fall within the statute prohibiting knowing concealment of stolen property.

■ The court in *Ryder* suspended the attorney, holding that his actions did not fall within the protection of the attorney-client privilege. The court noted, however, that neither the client nor his attorney could be compelled to produce merely evidentiary articles, as opposed to fruits or instrumentalities of the crime. This dictum was based on the notion that such merely evidentiary articles could not even be seized in a legal search; and, therefore, their production could not be compelled. *In re Ryder, supra* at 366, citing *Hayden v. Warden*, 363 F.2d 647 (4th Cir. 1966), *rev'd* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The rule that mere evidence may not be seized in a lawful search has since been disapproved. *Warden v. Hayden*, 387 U.S. 294, 306–307, 87 S.Ct. 1642, 1649–1650, 18 L.Ed.2d 782, 791–92 (1967). Therefore, we think that no distinction should be drawn in the privilege context between physical evidence obtained by a criminal defense attorney which is "mere evidence" of a client's crime and that which may be said to be either a fruit or an instrumentality of the crime.[13]

One additional decision will be mentioned. In *Thornton v. United States*, 357 A.2d 429 (D.C.App.), *cert. denied* 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), the defendant completely altered his story about the circumstances surrounding the crime when his attorney showed him evidence already in the possession of the prosecution. The defense attorney attempted to withdraw from the case for ethical reasons but was denied leave to withdraw. At trial he conducted himself in accordance with the relevant American Bar Association Standard.[14]

13. *In re January 1976 Grand Jury*, 534 F.2d 719 (7th Cir. 1976), considered an attorney's refusal to comply with a subpoena duces tecum issued by a grand jury ordering him to produce money received from his clients, two bank robbery suspects. The Court of Appeals held that non-compliance with the subpoena was not excused by the Fifth Amendment, the attorney-client privilege, or the clients' right to counsel. In rejecting the attorney-client privilege claim, the Court of Appeals expressly adopted the rule stated by *In re Ryder*, 263 F.Supp. 360 (E.D.Va. 1967), *aff'd*, 381 F.2d 713 (4th Cir. 1967).

14. Standard 7.7 of the American Bar Association Standards Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) reads:
 7.7 Testimony by the defendant.
 (a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely.
 (b) If, before trial, the defendant insists that he will take the stand to testify falsely,

On appeal, the defendant attacked the effectiveness of the counsel he had received. The Court of Appeals stated that while defense counsel has an obligation to defend a client with all his or her skill and energy, counsel also has moral and ethical obligations to the court. Confronted with a conflict between these two sets of obligations, defense counsel must use "all honorable means" to see that justice is done, rather than going to any lengths to see that a defendant is acquitted. The course of conduct followed by defense counsel was held to be appropriate.[15]

■ From the foregoing cases emerges the rule that a criminal defense attorney must turn over to the prosecution real evidence that the attorney obtains from his client. Further, if the evidence is obtained from a non-client third party who is not acting for the client, then the privilege to

refuse to testify concerning the manner in which the evidence was obtained is inapplicable. We think the foregoing rules are sound, and we apply them in reaching our resolution of the effective assistance-of-counsel issue in the case at bar.[16]

Morrell correctly cites cases which establish that misprision statutes are generally interpreted to require an affirmative act of concealment in addition to a failure to disclose a crime to the authorities. *See United States v. Daddano*, 432 F.2d 1119 (7th Cir. 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971). However, the cases disciplining attorneys for failing to turn over evidence or upholding denials of motions to suppress evidence turned over by attorneys do not rest alone on the notion that an attorney who does not turn over such evidence may be guilty of a crime. The cases cited are also based on the propo-

the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary.

(c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, the lawyer may not lend his aid to the perjury. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not recite or rely upon the false testimony in his closing argument.

15. In *Matter of Victor*, 422 F.Supp. 475 (S.D.N.Y.1976), the District Court ordered enforcement of grand jury subpoenas requiring production of certain documents which had come to an attorney in a manner which negated any possible privilege. The court stated that in order to be privileged, a communication must have been made in confidence and maintained in confidence. While these documents might have been privileged if they had come into the attorney's hands directly from his client, the

documents had been delivered to the attorney in a manner which made them readily viewable by third parties.

In *Hughes v. Meade*, 453 S.W.2d 538 (Ky. 1970), an order holding an attorney in contempt was upheld. The attorney had refused to give his client's name. He had been retained on the occasion in question solely to deliver a stolen typewriter to the police. The Kentucky court held that even if an attorney-client relationship had been established, the transaction involved did not involve an act by the attorney in his professional capacity, nor did it constitute the rendition of legal services. Therefore, the attorney-client privilege was not applicable.

In *State v. Dillon*, 93 Idaho 698, 471 P.2d 553 (1970), *cert. denied*, 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971), the defendant contended that he was entitled to suppression of evidence given by his parents to his attorney and subsequently subjected to discovery by the prosecution. The Idaho court held that the privilege against self-incrimination was inapplicable because the evidence (items taken in a burglary from the murder victim's home) was noncommunicative, real evidence. Further, the court stated that the attorney-client privilege does not allow an attorney to act as a depository for evidence of a crime or to aid in suppression of such evidence.

16. See Comment, *The Right of a Criminal Defense Attorney to Withhold Physical Evidence Received From His Client*, 38 U.Chi.L.Rev. 211 (1970).

sition that it would constitute unethical conduct for an attorney—an officer of the court—to knowingly fail to reveal relevant evidence in a criminal case.

We believe that Cline would have been obligated to see that the evidence reached the prosecutor in this case even if he had obtained the evidence from Morrell. His obligation was even clearer because he acquired the evidence from Wagner, who made the decision to turn the evidence over to Cline without consulting Morrell and therefore was not acting as Morrell's agent.

 Since Cline was obligated to see that the evidence reached the prosecutor, Morrell cannot have been deprived of effective assistance of counsel by Cline's decision to return the evidence to Wagner. Further, Cline's efforts to aid Wagner's transfer of the evidence to the police appear to have been within the scope of Cline's obligation. Cline could have properly turned the evidence over to the police himself and would have been obliged to do so if Wagner had refused to accept the return of the evidence.[17]

One additional aspect of this issue remains for discussion. As was noted earlier, the Ethics Committee of the Alaska Bar Association gave Cline an advisory opinion as to what to do with the questioned legal pad. The opinion advised Cline to return the subject papers to Wagner, to explain to Wagner the law on concealment of evidence,[18] and to withdraw from the case if it later became obvious to Cline that a violation of ethical rules would result from his continued representation of Morrell. On June 6, 1977, the Board of Governors of the Alaska Bar Association adopted Ethics Opinion 76–7 which embodied the advice the Ethics Committee had earlier given Cline. The opinion also stated, however, that Cline would be ethically obligated not to reveal the existence of the physical evidence "unless required to do so by statute." The Bar Association declined to render an opinion as to the applicability of AS 11.30.-315 or other state law.

 We think Cline followed the advice of the Bar Association in relation to his dealings with Wagner. It also appears to us that Cline could have reasonably concluded that AS 11.30.315 required him to reveal the existence of the physical evidence; and thus, although he affirmatively involved himself in the revelation of the evidence's existence, he did follow the advice of the Bar Association as it dealt with his obligation to preserve his client's secrets.[19]

Assuming Ethics Opinion 76–7 is a correct statement of the law, whether Cline

---

**17.** The only remaining question is whether Cline's testimony concerning the Wagner incident was within the attorney-client privilege and, if it was, whether the testimony deprived Morrell of his rights to effective assistance of counsel and to a fair trial. While the *Olwell* rule might have imposed a duty on Cline to remain silent as to these matters if Cline had obtained the evidence from Morrell, the acquisition of incriminating evidence from a nonclient third party who is not acting as a client's agent falls outside the attorney-client privilege. Cline could not have claimed that the attorney-client privilege precluded him from testifying as to his acquisition of the evidence from Wagner. Therefore, Morrell cannot have been deprived of effective assistance of counsel by Cline's testimony.

**18.** AS 11.30.315 provides:
*Destroying, altering or concealing evidence.* A person who wilfully destroys, al-

ters or conceals evidence concerning the commission of a crime or evidence which is being sought for production during an investigation, inquiry or trial, with the intent to prevent the evidence from being discovered or produced, is guilty of a misdemeanor and upon conviction is punishable by imprisonment for not more than one year, or by a fine of not more than $1,000, or by both.

**19.** Disciplinary Rule 4–101(A) of the American Bar Association's Code of Professional Responsibility differentiates between client confidences and client secrets. The former refers to information protected by the attorney-client privilege. The latter refers to other information gained in the professional relationship, the disclosure of which would be likely to be detrimental to the client. An attorney has a duty to preserve both client confidences and client secrets except as provided by Disciplinary Rules 4–101(C) and (D).

rendered effective counsel then turns on whether he could reasonably have concluded that AS 11.30.315 required him to reveal the existence of the evidence. Otherwise, the opinion states that he had an ethical obligation not to reveal the evidence. AS 11.30.315 makes it a crime to wilfully destroy, alter or conceal evidence concerning the commission of a crime or evidence which is being sought for production during an investigation, inquiry or trial, with the intent to prevent the evidence from being discovered or produced.[20] While statutes which address the concealing of evidence are generally construed to require an affirmative act of concealment in addition to the failure to disclose information to the authorities,[21] taking possession of evidence from a non-client third party and holding the evidence in a place not accessible to investigating authorities would seem to fall within the statute's ambit.[22] Thus, we have concluded that Cline breached no ethical obligation to his client which may have rendered his legal services to Morrell ineffective.[23]

■ Morrell's final point in this appeal relates to the sentence which the superior

court imposed. As to this specification of error, Morrell first contends that the superior court violated his Fifth Amendment privilege against self-incrimination, when in sentencing the court considered his refusal to admit guilt.[24] Morrell points to the following portion of the sentencing court's remarks as violating his privilege against self-incrimination:

. . . what kind of defendant would be given a maximum sentence. And that would be an unregenerate multiple offender . . . [o]ne who continues to commit a criminal act—criminal acts, in society, without any fear of punishment, or doesn't care if he's in jail or not, because the minute he gets out he's going to commit another offense. That kind of a person needs to be removed from society for his natural life—permanently.

In our opinion the above quoted portions of the sentencing court's remarks do not support Morrell's position. The superior court's sentencing remarks do not indicate that he increased Morrell's sentence because Morrell continued to maintain his innocence. The sentencing court merely stated

---

**20.** *See* note 18, *supra.*

**21.** *See United States v. Daddano,* 432 F.2d 1119 (7th Cir. 1970), *cert. denied,* 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971); *United States v. King,* 402 F.2d 694 (9th Cir. 1968).

**22.** In *United States v. King,* 402 F.2d 694 (9th Cir. 1968), the defendant received from a group of bank robbers money which he knew to be stolen. The court concluded that the prosecution had failed to establish beyond a reasonable doubt that the defendant's act and purpose in receiving the money was an affirmative step designed to conceal the crime. The record did not indicate how much money the defendant had received, nor did it negate the possibility that the defendant may have received the money simply in repayment of a prior loan to his brother, who was one of the bank robbers.

Whether proof that Cline had received evidence of the Morrell crime could alone establish the necessary affirmative act of concealment beyond a reasonable doubt might seem doubtful under *King,* except for the fact that Cline—unlike *King*—had no other possible reason for taking and retaining possession of the evidence.

**23.** The American Bar Association Committee on Ethics and Professional Responsibility has issued two opinions which address analogous problems and provide additional support for our conclusion. Informal Opinion 1057 (1968), advises that lawyers must comply with statutes pertaining to suppression of evidence. It states, that an attorney is not justified in holding evidence of a client's crime on the basis of the attorney-client relationship.

Formal Opinion 341 (1975), states, in part: [T]he duty imposed by DR 7–102B [to reveal to the court certain information concerning frauds being perpetrated upon a person or tribunal] would remain in force if the information . . . were obtained by the lawyer from a third party (but not in connection with his professional relationship with the client), *because it would not be a confidence or secret of a client entitled to confidentiality.*

**24.** Morrell cites *United States v. Laca,* 499 F.2d 922, 927 (5th Cir. 1974). The court said, in part, "This conditioning of sentences on defendants' confessions violated their right to avoid self-incrimination under the Fifth Amendment."

that an "unregenerate multiple offender," —defined as one who would commit another offense upon release—should be given the maximum sentence allowable. Thus, we conclude that Morrell's Fifth Amendment assertions are devoid of merit.

■ Morrell further contends that the sentence he received is excessive. As was mentioned at the outset of this opinion, Morrell was sentenced to life imprisonment on the kidnapping charge, to 5 years on the assault with intent to commit rape charge, and to 10 years on each of the 8 rape charges. The assault and rape sentences were to run concurrently, but the life sentence was to run consecutively to the other sentences.

The gist of Morrell's excessive sentence argument is that he should not have received the maximum sentence because he was not "the worst type of offender." *See, e. g., State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975). The state counters by arguing that Morrell did not receive a maximum sentence. In particular, the state contends that the sentencing court "had before it a man found guilty of ten felonies, for which he could be sentenced to 170 years plus life." [25]

Given the seriousness of the offenses of which Morrell was convicted and the particular circumstances surrounding the crimes, we cannot conclude that the superior court was clearly mistaken in imposing the questioned sentences.

Affirmed.

MATTHEWS, J., not participating.

BOOCHEVER, Chief Justice, dissenting in part.

I believe that the sentence in this case was excessive. The court sentenced Morrell to life imprisonment on the kidnapping charge to run consecutively to the eight ten-year concurrent terms of imprisonment he was sentenced to on the forcible rape convictions and the five-year concurrent term on his conviction of the single count of assault with intent to commit rape. I, in no manner, intend to minimize the atrocious conduct involved in this case nor the seriousness of the crime. Nevertheless, Morrell did release his victim without serious physical harm. Under these circumstances, I do not believe that the total sentence imposed for the incidents involved should exceed life imprisonment.[1] To the extent that the additional sentences were made to run consecutively to the life imprisonment sentence, I believe that the trial judge was clearly mistaken.

---

**25.** The state also notes that it recommended sentencing Morrell to concurrent 20-year terms on the rape counts and life for the kidnapping. The state further observes that the superior court did not fix any minimum term before Morrell is to be eligible for parole. *See* AS 33.15.230.

**1.** AS 33.15.080 specifies in part:

However, no prisoner may be released on parole who has not served at least one-third of the period of confinement to which he has been sentenced, or in the case of a life sentence, has not served at least 15 years.